470 F.2d 820
 AMERICAN REPUBLIC INSURANCE COMPANY, a corporation,
Plaintiff-Appellant,
v.
UNION FIDELITY LIFE INSURANCE COMPANY, a corporation, et
al., Defendants-Appellees.
AMERICAN REPUBLIC INSURANCE COMPANY, a corporation, Plaintiff-Appellee,
v.
UNION FIDELITY LIFE INSURANCE COMPANY, a corporation,
Defendant-Appellant.
 Nos. 26130, 26131.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 27, 1972.
 
 Roland F. Banks, Jr. (argued), Rockne Gill, of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for plaintiff-appellant.
 George L. Wagner (argued), James C. Dezendorf, of McColloch, Dezendorf, Spears & Lubersky, Portland, Or., for defendants-appellees.
 Before BROWNING, MOORE* and WRIGHT, Circuit Judges.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 This appeal arises from an unfair competition suit brought by American Republic Insurance Company ("American"), against Union Fidelity Life Insurance Company ("Union") and fourteen individual defendants. The action was dismissed before trial as to all but two of the individuals (LeRoy C. Lindgren and Robert Anderson). Separate trials on liability and damages resulted in an award to American of $10,037.00 general damages, $20,000.00 punitive damages, and $10,000.00 attorneys' fees.[1]
 
 
 2
 American appeals, contending that the court should have allowed greater damages and more attorneys' fees. Union cross-appeals, contending that the court erred in allowing the plaintiff any recovery. Neither individual defendant is a party to this appeal.
 
 THE FACTS
 I. Generally
 
 3
 American is a mutual insurance company engaged in selling health and accident insurance and a small amount of life insurance. Its sales are conducted through state or area organizations, each supervised by a state or area manager. Under their direction are salesmen selling exclusively for American. They call on prospective policyholders, following "leads" developed from national and local advertising campaigns conducted by American.
 
 
 4
 American's home office distributes the leads to sales managers who in turn pass them on to salesmen. American's salesmen also sell additional insurance to existing policyholders.
 
 
 5
 In January 1967, Lindgren was American's area manager for Oregon and Western Washington and Anderson was his subordinate manager for the Washington area. Lindgren had been American's Oregon manager for most of the preceding eight years. The Washington agency was newer, Anderson being in charge of it since its inception in November 1966. As of January 1967 there were 25 full-time salesmen, in addition to Lindgren and Anderson, in the Oregon-Washington areas.
 
 
 6
 Union also is in the health and accident insurance business and, before 1967, operated primarily through the American Agency System, a standard arrangement in national use. Agents licensed under this system were not required to sell exclusively for one company and most held licenses with other companies as well as Union.
 
 
 7
 The goal of the American Agency System was to have as many agents as possible, each producing some business for the company. Union had many such agents throughout the United States, including Washington and Oregon.
 
 
 8
 In December 1966 Union established a "Career Division," offering exclusive franchises to experienced accident and health managers willing to sell only Union policies. This was a method similar to American's operation.
 
 
 9
 II. Union's Contracts with Lindgren and Anderson
 
 
 10
 As part of Union's effort to establish its Career Division it communicated with area managers of other companies. Lindgren's name and position with American had been known to Union since 1964 as a result of some aborted discussions about a possible change in employment. On February 2, 1967 Union sent Lindgren a letter describing Union's Career Division and a "Confidential Questionnaire to Harry T. Dozor, President." Lindgren completed and returned the questionnaire, indicating that he had 27 agents under him "working from a mail lead basis-received through Co. paid national advertising and local advertising."
 
 
 11
 On February 14 Alfred Coletta, Vice President of Union, wrote to Lindgren suggesting a telephone discussion of the Career Division. He indicated that the new division was designed to attract men "who have an agent's following." Lindgren replied on February 17 that he felt he could retain "a good 90% of the organization." Apparently Lindgren did not mean by this that he could bring along 90% of the agents, because he used the figure ten agents as the minimum he could expect to retain.
 
 
 12
 Negotiations continued through February and March. In a March 10 letter Lindgren said he wanted Anderson included in future discussions. The dealings culminated in contracts between Lindgren and Union and Anderson and Union, signed on April 10, 1967. The trial court found that Lindgren
 
 
 13
 "was hired in the 'Career Division' primarily because Dozer [sic] and Colleta [sic] thought he could transfer his organization and business to Union." American Republic Ins. Co. v. Union Fidelity Life Ins. Co., 295 F. Supp. 553, 555 (D.Ore.1968).
 
 III. The Events Subsequent to April 10, 1967
 
 14
 After signing the new contracts, Lindgren and Anderson returned to Oregon, promising to notify Dozor and Coletta when they formally resigned from American. Resignation came on April 22, and during the interval, Lindgren attempted to persuade his subordinates to leave American and join him at Union. He succeeded to the extent that seven salesmen signed contracts with him prior to April 22 and eight others followed thereafter. On April 22 Lindgren terminated the remaining agents of American and submitted his own resignation.
 
 
 15
 Union was aware by April 17, 1967 that Lindgren was recruiting employees of American to work for Union, although Lindgren was still an employee of American. When Lindgren signed an agent to a contract he completed for him an "Information Questionnaire and Request for Agent's License," which was forwarded to Union's offices in Philadelphia. The first was received on April 17, five days before Lindgren notified Coletta of his resignation.
 
 
 16
 After his resignation, Lindgren retained customer lead cards and other material with the names of actual and potential customers of American. Despite denials by Lindgren that he used this material the court found, on the basis that he retained it, and that a high percentage of Union policies were sold to former policyholders of American, that Lindgren must have used it. The finding was justified.
 
 
 17
 American filed this action on May 9, 1967, seeking damages in excess of $5 million and a preliminary injunction against Lindgren's continued use of its customer leads. An injunction was granted on May 29, 1967 and by consent was made permanent on August 16, 1967. There is much debate in the briefs as to the content of these injunctions and whether they were violated by Lindgren or others. Our disposition makes it unnecessary to consider these questions.
 
 
 18
 Because the cross-appeal involves issues of liability as well as damages and the direct appeal involves only issues of damages, we shall consider the cross-appeal first.
 
 THE ISSUES RAISED BY UNION'S CROSS-APPEAL
 
 19
 Union in its cross-appeal contends that (1) it had a competitive privilege to solicit the services of Lindgren and Anderson; (2) the actions of Lindgren and Anderson subsequent to April 10, 1967 did not constitute unfair competition; (3) there was no evidence that Union participated in the illegal actions of Lindgren and Anderson; and (4) American's losses were not the proximate result of any acts of unfair competition. Union also contests the award of punitive damages and attorneys' fees.
 
 
 20
 Because we find that Union was a party to the illegal actions of Lindgren and Anderson it is unnecessary to consider Union's competitive privilege. The trial court found that Lindgren and Anderson were guilty of two distinct acts of unfair competition against American: the hiring of other employees of American by Lindgren while he was still in its employ, and the use of American's written customer lists to solicit customers for Union.
 
 
 21
 These activities did constitute unfair competition and we find that Union was, or should have been, aware that they were going on. Under the circumstances Union could not remain silent and accept benefits derived from the activities of Lindgren and Anderson.
 
 
 22
 I. Lindgren's Solicitation of Fellow Employees
 
 
 23
 The law is reasonably clear that Lindgren would have been within his rights had he waited until he severed his employment with American to begin recruiting his subordinates there. Knudsen Corporation v. Ever-Fresh Foods, Inc., 336 F.Supp. 241 (C.D.Cal.1971); Marine Forwarding & Shipping Co. v. Barone, 154 So.2d 528 (La.App.1963).
 
 
 24
 Union urges that we disregard the fact that Lindgren did not wait until his resignation to commence recruiting for Union. This we decline to do. Until April 22, 1967, Lindgren was an employee of American and owed it the usual duty of loyalty. A case much like this is Bancroft-Whitney Co. v. Glen, 64 Cal.2d 327, 49 Cal.Rptr. 825, 411 P.2d 921 (1966) where the court said:
 
 
 25
 "The undisputed evidence shows a consistent course of conduct by [Glen] designed to obtain for a competitor those of plaintiff's employees whom the competitor could afford to employ and would find useful. If Glen while still president of plaintiff had performed these acts on behalf of Bender Co. [plaintiff's competitor] without also obligating himself to join the company, there could be no doubt that he would have violated his duties to plaintiff. Surely his position in this regard cannot be improved by the fact that he was also to be employed by Bender Co. . . ." 49 Cal.Rptr. at 840, 411 P.2d at 936.
 
 
 26
 See also Restatement (Second) of Agency Sec. 393, Illustration 1; Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1954).
 
 
 27
 Union cites three cases to support its claim that Lindgren committed no actionable wrong. The first, Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F.Supp. 250 (S.D.Cal.1958), aff'd 283 F.2d 695 (9th Cir. 1960), cert. denied 365 U.S. 869 (1961), is not in point because the legality of the employee's conduct was not an issue in that case. The court there considered only whether the new employer, Audio, was engaged in a conspiracy to "entice" employees away from the plaintiff. The court held that the evidence of a conspiracy was insufficient.
 
 
 28
 Union also relies upon the opinion of the trial court in E. V. Prentice Dryer Co. v. Northwest Dryer & Machinery Co., 4th Jud.Cir., November 9, 1965 (unpublished), aff'd 246 Or. 78, 424 P.2d 227 (1967). It does not appear from the opinion in that case whether the defendant Gordon was still employed by plaintiff when he offered positions to several of plaintiff's employees. The court indicated that a schedule of resignations was set up for those who agreed to leave plaintiff's employ. But no mention was made of a date for Gordon to resign, suggesting strongly that he had already resigned. If so, the case is not at all analogous to that before us. In any event, the plaintiff there had alleged a conspiracy among all employees who had departed and the court found that none existed. The legality of Gordon's conduct, considered alone, was not an issue.
 
 
 29
 Finally, Union relies on National Rejectors, Inc. v. Trieman, 409 S.W.2d 1 (Mo.1966). The district judge, well versed in Oregon law, held that this case, to the extent that it could not be reconciled with Duane Jones, Bancroft-Whitney and the Restatement, would not be followed by the Oregon courts. We find no reason to disagree with this view of Oregon law.
 
 
 30
 II. Lindgren and Anderson's Use of Customer Leads
 
 
 31
 Although numerous cases on the subject of competition by a former employee for the customers of his former employer[2] tend to turn on their specific facts, certain general principles can be stated. On the one hand courts are agreed that there is no proprietary right to customers or proposed customers. E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108, 1116 (8th Cir. 1969). However, courts will use a variety of theories to protect an employer from competition by a former employee using written customer lists which he had no hand in preparing. See, e. g., Port Investment Co. v. Oregon Mut. Fire Ins. Co., 163 Or. 1, 94 P.2d 734 (1939); Dozor Agency, Inc. v. Rosenberg, 218 A.2d 583 (Pa.1966).
 
 
 32
 The present is such a case. No question is raised that the customer lists were the work product of American's home office, nor is there any question that prior to the May 29th injunction Lindgren and the other former employees of American were permitted to use them freely.[3]
 
 
 33
 The district court found that the lists were used to solicit customers for Union. We have already concluded that this finding was supported by substantial evidence. It is thus beyond question that those former employees of American who used the lists were guilty of unfair competition.
 
 
 34
 III. Union's Participation in the Unfair Competition
 
 
 35
 Union contends that it cannot be held accountable for the acts of Lindgren and Anderson because "[t]here is absolutely no evidence that customer lists were ever considered or discussed or that Union had any interest in or knowledge about how Lindgren and Anderson were going about their business." This assertion is not supported by the record.
 
 
 36
 In the Confidential Questionnaire Lindgren informed Union that his "entire organization is working from a mail lead basis-received through Co. paid national advertising and local advertising." From this, Union knew of the strong likelihood that any use Lindgren made of these leads would be in derogation of the rights of American.
 
 
 37
 Yet when it appeared that Lindgren was soliciting former customers of American, Union made no effort to check further on his activities nor to prevent Lindgren and Anderson from enlisting other salesmen of American to work for Union.
 
 
 38
 Union received great economic benefits from Lindgren's new agency. Ignorance and inaction will not suffice to avoid responsibility for American's losses.
 
 IV. Causality
 
 39
 Union next says that the loss suffered by American was not proximately caused by the actions of Lindgren and Anderson and contends: first, that Lindgren's recruiting efforts did not cause anyone to leave American who would not otherwise have left and second, that American's injuries were due solely to the latter's inability to replace departing employees because of the resignation of Lindgren, its chief recruiter in the Washington-Oregon area. In support of both contentions Union points to the evidence of high turnover and employee dissatisfaction.[4]
 
 
 40
 We cannot accept either contention. Lindgren attempted to persuade nearly all of American's sales force to follow him to Union and, in doing so, violated the duty of loyalty that he owed to American. Sixteen salesmen accepted his offer. That is sufficient to show the requisite causality. The existence of high turnover and employee dissatisfaction is significant only in determining the extent of American's loss attributable to Lindgren's actions.
 
 
 41
 We reject also the notion that American suffered injury only because of the loss of its area manager. The argument assumes that American's entire sales force would have left in late April irrespective of the opportunities offered by Lindgren. It also assumes that but for the loss of Lindgren American would have been able to replace the entire sales force immediately upon the mass departure. Without strong evidence to show that either assumption is warranted the inference is otherwise. Under these circumstances the award of $10,037.00 was entirely reasonable.[5]
 
 V. The Award of Attorneys Fees
 
 42
 The district court awarded American attorneys fees of $10,000.00 and punitive damages of $20,000.00. Union contends that neither award was proper under the facts. As to the punitive damages we disagree. The evidence was that Union acted in willful, wanton and reckless disregard of the rights of American. Douglas v. Humble Oil & Refining Co., 251 Or. 310, 445 P.2d 590 (1968).
 
 
 43
 The award of attorneys fees was not proper. While there is no Oregon case in point the best indication we have of Oregon law is Huffstutter v. Lind, 250 Or. 295, 442 P.2d 227 (1968), where the court said:
 
 
 44
 "In the absence of contract, attorneys fees are allowable only where there is statutory authority. Draper v. Mullennex, 225 Or. 267, 271, 357 P.2d 519 (1960)." Id. at 301, 442 P.2d at 230.
 
 
 45
 American does not contend that there is statutory authority and we must reverse the award of attorneys fees.
 
 THE ISSUES RAISED BY AMERICAN'S APPEAL
 
 46
 On its direct appeal American contends that the court committed error in the award of damages. The contentions are without merit.
 
 
 47
 The court awarded American $10,037.00 as general damages, of which only $5,949.00 representing lost profits from Oregon health and accident insurance sales is at issue on this appeal. The court reached this figure by this formula:
 
 
 48
 Multiplying the number of policies lost (found to be 3,133)
 
 
 49
 x
 
 
 50
 The average life of each policy (found to be 2.87 years)
 
 
 51
 x
 
 
 52
 The average annual premium (found to be $42.96)
 
 
 53
 x
 
 
 54
 The percentage of each premium that is profit to the company (found to be 1.54%).
 
 
 55
 Only the last of these figures is contested by American. It argues that under the formula adopted by the trial court the correct profit should have been 19.04% and that the failure of the court to use this figure was inadvertent and a technical error. Not so.
 
 
 56
 The court carefully considered the 19.04% figure and rejected it. Considering that adoption of this figure would have meant that the Oregon business was seventeen times more profitable than business in the nation as a whole we find that this rejection was completely justified.
 
 
 57
 The district court also rejected a claim by American for $19,406.88 which it claimed to have expended in an effort to rebuild its Oregon-Washington agency. We agree that these expenses were not proved.
 
 CONCLUSION
 
 58
 Remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Leonard P. Moore, Senior United States Circuit Judge, for the Second Circuit, sitting by designation
 
 
 [1]
 The opinions below are reported at 295 F. Supp. 553 (D.Ore.1968) and 315 F.Supp. 311 (D.Ore.1970)
 
 
 [2]
 A thorough compilation of cases and articles is found in Annotation, 28 A.L.R.3d 7 (1969)
 
 
 [3]
 Union argues that the customer lead cards were actually the personal property of the individual salesmen. Even if this were the case it would not necessarily follow that they were entitled to make free use of the information contained therein. Cf. Baker v. Libbie, 210 Mass. 599, 97 N.E. 109 (1912)
 
 
 [4]
 The evidence showed that 65% of American's sales force had to be replaced in 1966. The average stay of the departing salesmen was 10.2 weeks. It is not shown what the average stay of all salesmen was. As to employee dissatisfaction, six former salesmen of American testified that they were unhappy there. The others did not testify. On this evidence the trial court was justified in concluding that the entire sales force was not on the verge of leaving
 
 
 [5]
 We need not consider whether the damage award is justified on the basis of the profits lost to American because of the loss of its customer lists