FINANCIAL PROGRAMS, INC., a Delaware corporation, et al., Plaintiffs,

v.

FALCON FINANCIAL SERVICES, INC., a Missouri corporation, et al., Defendants.

Civ. No. 72–745.

United States District Court, D. Oregon.

Feb. 5, 1974.

Barnes H. Ellis, David G. Hayhurst, John M. Schweitzer, of Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for plaintiffs.

Peter A. Schwabe, Jr., of Schwabe & Schwabe, Portland, Or., for defendant White.

A. Allan Franzke, Donald Joe Willis, of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for other defendants.

## OPINION

SKOPIL, District Judge:

### I.

### INTRODUCTION

Plaintiffs, four mutual funds and a mutual fund management company, assert claims against defendants, a broker-dealer corporation and some of its officers and employees, for alleged acts of unfair competition, commercial disparagement, interference with contractual relations, and securities law violations.

### II.

### JURISDICTION

I find that the Court lacks jurisdiction over the securities law claims because the plaintiffs have not established that they were defrauded purchasers. However, jurisdiction over the remainder of plaintiffs' claims exists under 28 U.S.C. § 1332. There is diversity of citizenship, and the plaintiffs have alleged in good faith that the amount in controversy, exclusive of interest and costs, exceeds $10,000.

### III.

### FACTS

Financial Programs, Inc. (hereinafter FPI) is the investment adviser and underwriter for four affiliated, open-end investment companies: Financial Industrial Fund, Inc.; Financial Industrial Income Fund, Inc.; Financial Dynamics Fund, Inc.; and Financial Venture Fund, Inc.; (hereinafter the Funds). FPI is compensated by the Funds on a fee basis computed as a percentage of the net assets of the Funds. As open-end registered investment companies, each of the Funds stands ready to redeem at net asset value shares tendered by its shareholders.

Prior to July, 1972, the Funds had operated as "load" mutual funds with sales fees being charged to investors at the time of the initial purchase. FPI maintained a sales force, whose commissions were taken from the proceeds of the charges. Divisional offices were maintained in most major cities.

On July 11, 1972, FPI summoned approximately sixty of its divisional managers, district managers, regional managers, and high-production sales representatives to a meeting in Denver, Colorado. Defendants Day and White were among those who attended. At that meeting FPI announced its decision to

change the Funds from "load" to "no load". As "no load" funds, there would no longer be a sales charge to investors. Shares in the Funds would be marketed through general advertising efforts, and investors' services would be handled primarily through toll-free telephone service to Denver. FPI therefore announced that it would be terminating the employment of its field sales force and closing its offices throughout the country.

The sales personnel in attendance were advised that new employment for them had been arranged with Hamilton Management Corporation (hereinafter Hamilton), another Denver-based mutual fund management company. FPI and Hamilton had previously entered into a contract. Hamilton was to acquire all of the leasehold, furnishings, and fixtures of the various FPI offices; and FPI was to utilize its best efforts to persuade its former sales force to affiliate with Hamilton.

Hamilton then conducted a series of meetings, at which it attempted to persuade the former FPI employees to join Hamilton. During one of the meetings, a vice president of FPI was asked what was to be done with FPI's field office records. The inquirer stated that he did not want to destroy the records but wanted to keep them. The FPI officer responded, "Okay".

While in Denver, defendant White met the Hamilton Seattle Sales Manager, Burton Severeid, with whom he discussed arrangements for transferring the Seattle office of FPI to Hamilton. They agreed to meet at the Seattle FPI office at 9:00 a. m. on Monday, July 17, 1972, to effect a transfer.

On July 14 defendant Foss, a Vice President of defendant Falcon Financial Services, Inc. (hereinafter Falcon), a broker-dealer corporation, telephoned White. He had previously attempted to persuade White to join Falcon. On July 15 White met with Foss and defendant Dennis, the President of Falcon, at Falcon's Seattle office. After the meeting, White agreed to join Falcon as its Se-

attle Sales Manager. As compensation, he was to receive 65 percent of sales commissions on mutual fund sales effected by him individually and an override commission on sales generated by sales representatives under his supervision.

On July 16 White and Foss went to the offices of FPI. They removed a large quantity of files. Some of the FPI files, including customer lists, were taken to the Falcon offices. The balance of the files went to White's residence.

After commencing employment with Falcon, White prepared a letter on FPI's letterhead. He had obtained the letterhead stationery from FPI's office. The letter was reviewed and edited by Dennis. It was prepared and transmitted, in FPI envelopes, at Falcon's expense, to more than 1,000 shareholders of the Funds. The names and addresses were obtained from the files removed from FPI's office. The letter was antedated to July 14, 1972, and signed by White, who identified himself as Divisional Manager for FPI. It read as follows:

"This is in reference to the letter you received recently in which you were advised that the company has discontinued the use of field representatives. In keeping with that decision, and as divisional manager of the company, I wish to advise you that this office has been closed effective this date.

"Our experience has been that our clients continue to have a need for our service over the years, and this letter is to assure you that while the company has seen fit to disassociate their clients from their field representatives, I will continue to work with you and for you in the future as I have in the past.

"Please contact me at 789-2144 or 232-3884 if you have any questions concerning your account, or if you wish to discuss the company's action. I will contact you in the near future and wish to thank you for having had the privilege of serving you."

One of the telephone numbers referred to was White's home telephone, and the other was Falcon's office number. White received approximately one hundred responses to the letter.

After sending the letter, White began systematic solicitation of the Funds' shareholders. The names were obtained from FPI's records. In most, if not all, of his contacts with shareholders, White recommended that they liquidate their holdings in the Funds and reinvest in load funds.

In his meeting with Foss and Dennis, White discussed the possibility of Falcon's hiring other FPI sales personnel. On two occasions White telephoned Day, FPI's former Divisional Manager for Oregon, to persuade him to join Falcon.

While in Denver, Day had met Hamilton's Portland Divisional Manager, Patrick Byrne. Day told Byrne that he desired to join Hamilton in Portland. Day executed employment and license transfer forms. After returning to Oregon, he reaffirmed to Byrne his intention to join Hamilton.

On August 1, 1972, White and Dennis came to Oregon to confer with Day and defendant Fahlman. Fahlman had been an FPI sales representative in the Portland office for about a year and one-half. White observed that Day had FPI records, and Day told the others that he had the files intact. The parties discussed White's success in effecting redemptions in the Seattle area. White told Day and Fahlman about the letter he had sent on FPI's letterhead to the Funds' shareholders. He suggested that such a letter might be sent to shareholders in the Portland area.

On August 8, 1972, Day and Fahlman went to Seattle for a meeting with Foss, Dennis, and White. Day confirmed to the Falcon representatives that he had FPI's records and would use them. Day and Fahlman were hired as Co-Divisional Managers of a proposed new Falcon Portland office. Fahlman was to be the principal operating officer responsible for recruiting, training, and supervising salesmen. His compensation was set at 65 percent of direct sales of mutual funds, with a percentage override on any sales generated by salesmen under his supervision, except Day. It was agreed that Falcon would lease the premises formerly occupied by FPI, which were in a building owned by Day. The lease was conditioned upon Day's continuing to be employed by Falcon for the three-year term of the lease.

Upon returning to Portland, Day informed Byrne that he would not join Hamilton and had instead accepted a position with Falcon.

Fahlman recruited defendant Krieger. He told Krieger that a comprehensive list of the Funds' shareholders in the Portland area was available and would provide a source of leads for Krieger.

Following his meeting with Fahlman, Krieger went to Seattle, where he met White, Foss, and Dennis. White told Krieger about the plan used in Seattle. He advised Krieger that the same pattern might be repeated in Portland. Krieger agreed to join Falcon.

Day gave Fahlman all of FPI's current available quarterly status reports, except those containing Day's accounts. These records included the name of each account, the account number, identification of the particular fund or funds held, number of shares purchased, amount invested, period of investment, and present status of payments on deferred payment accounts. Fahlman assigned the largest accounts to himself, Krieger, and David Henry.

Fahlman and Day prepared instructions for the sales representatives. FPI's customer lists were to be used in solicitations by telephone. Sales representatives were instructed to use their personal name and not the name of Falcon. They were to offer to meet with the shareholder to service the shareholder's account. If asked how the representative had obtained the shareholder's file, the representative was to state that he and others had taken over FPI's Portland office.

Fahlman and Krieger began telephonic solicitation. They visited several of the shareholders and advised them to liquidate their shares in the Funds. Not all of the shareholders believed that Fahlman and Krieger represented FPI, but several did. Not all of the shareholders redeemed their shares, but a few did.

The issuance of a Temporary Restraining Order on September 21, 1972, prevented completion of the Portland scheme.

## IV.

### PLAINTIFFS' CLAIMS

FPI contends that defendants' conduct constitutes unfair competition, commercial disparagement, and interference with contractual relations and has caused damage to FPI in the amount of $14,737.30. It also contends that Falcon has been unjustly enriched in the amount of $16,105.14 by the commissions it received between July 11, 1972, and December 31, 1972, from reinvestment of redemption proceeds, and should be required to account to FPI. FPI also seeks punitive damages in the amount of $100,000.00.

All plaintiffs contend that defendants' conduct constitutes fraudulent acts and practices in connection with the sale of securities in violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q; §§ 10 and 15 of the Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78o, and the rules and regulations promulgated thereunder, including 17 C.F.R. § 240.10(b)(5); O.R.S. 59.115 and 59.135; R.C.W. 21.20.430; and the rules and regulations of the National Association of Securities Dealers (NASD). Plaintiffs seek attorneys fees pursuant to O.R.S. 59.115 and R.C.W. 21.20.430.

Finally, plaintiffs urge that the Preliminary Injunction of November 8, 1972, be made permanent and the impounded records be delivered to the plaintiffs.

## V.

### SECURITIES LAWS

Section 10(b) of the 1934 Act and Rule 10b–5 require that the act complained of be "in connection with the purchase or sale of any security". In a private action for damages under Section 10(b), the plaintiff must be a purchaser or seller of the securities with respect to which he claims actionable fraud has occurred. Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339 (9th Cir. 1972).

Based on my Opinion of June 6, 1973, in the companion case of Financial Programs, Inc., et al. v. Foss Financial, Inc., Civil No. 72–848, I conclude that FPI cannot recover under Section 10(b) of the 1934 Act.

Although the Funds were purchasers of the securities, they were not purchasers protected by Section 10(b) and Rule 10b–5. Only a defrauded purchaser or seller is extended protection under Rule 10b–5. Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2nd Cir. 1952). Furthermore, the plaintiff must have purchased or sold the securities in reasonable reliance upon the misrepresentations of the defendant. Raschio v. Sinclair, 486 F.2d 1029 (9th Cir. Nov. 2, 1973). If any misrepresentations were made by the defendants, they were made to the shareholders, not to the Funds. If there was any securities fraud, it was perpetrated on the shareholders, not the Funds. The Funds were not defrauded purchasers, nor did they purchase the securities in reliance upon representations made by the defendants.

Plaintiffs also have failed to state a valid claim under Section 17(a) of the 1933 Act. Section 17(a) is even narrower than 10(b) with respect to the persons who may be liable. It prohibits fraud "in" the offer or sale of securities rather than merely "in connection with" an offer or sale. Section 17(a) applies only to fraud by sellers of securities. The defendants did not sell any of the securities in question.

■ Alleging violation of an NASD rule does not state a federal claim. The NASD is a private securities dealers' association which enforces its rules through disciplinary proceedings. A violation of these rules does not *per se* give rise to a federal private right of action. Hecht v. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970); McMaster Hutchinson & Co. v. Rothschild & Co., C.C.H.Fed.Sec.L.Rptr. ¶ 93,541 (N.D.Ill. Feb. 15, 1972).

■ Plaintiffs are also unable to assert valid claims under the blue sky laws of Oregon and Washington, O.R.S. 59.-115 and 59.135 and R.C.W. 21.20.430.

O.R.S. 59.115(1) states in relevant part:

"Any person who:

"(a) Offers or sells a security in violation of the Oregon Securities Law

. . . or

"(b) Offers or sells a security by means of an untrue statement of a material fact or . . . omission to state a material fact . . . is liable as provided in subsection (2) of this section to the person buying the security from him."

R.C.W. 21.20.430 states in relevant part:

"(1). Any person, who offers or sells a security in violation of any provisions of R.C.W. . . . or offers or sells a security by means of fraud or misrepresentation is liable to the person buying the security from him . . . ."

These statutes provide for recovery by the purchaser from the seller of the securities. Defendants did not sell securities to the plaintiffs.

O.R.S. 59.135 is a broad statute prohibiting fraud and deceit with respect to securities. It provides as follows:

"It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security or the conduct of a securities business or for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise:

"(1) To employ any device, scheme or artifice to defraud;

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

"(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person; or

"(4) To make or file, or cause to be made or filed, to or with the commissioner any statement, report or document which is known to be false in any material respect or matter."

This section does not provide for a private right of action. If such a right is implied, it only allows recovery by the defrauded person. If the defendants violated the statute, it was in their dealings with the shareholders. The Funds are not the parties protected within the meaning of O.R.S. 59.135, and they do not have a private right of action against the defendants under that section.

## VI.

UNFAIR COMPETITION, COMMERCIAL DISPARAGEMENT, AND INTERFERENCE WITH CONTRACTUAL RELATIONS

■■ To support a claim of commercial disparagement, a plaintiff has the burden of establishing that the defendant has made untrue or misleading statements which disparage the quality of the plaintiff's product or services. Aerosonic Corporation v. Trodyne Corporation, 402 F.2d 223, 231 (5th Cir. 1968). FPI has not satisfied this burden.

■ Interference with contract is an action which protects a person's interest in the security and integrity of the contractual relationships into which he has entered. Wampler v. Palmerton, 250 Or. 65, 439 P.2d 601 (1968). The only con-

tracts of FPI which are relevant to this case are the ones which it has entered into with the Funds. There is no evidence that the defendants interfered with this contractual relationship.

■ I now turn to FPI's claim of unfair competition. Agents in a confidential relationship may not use customer lists in competition with the employer who accumulated them. American Republic Ins. Co. v. Union Fidelity Life Ins. Co., 295 F.Supp. 553 (D.Or.1968). Day and White, as Divisional Managers, had a fiduciary relationship with FPI. Through this relationship they obtained possession and control of various records which were prepared by FPI. These records were confidential in that they were not available to competitors. They were distributed to Day and White to aid salesmen in servicing their accounts and in furthering the interests of FPI and the Funds.

■ Defendants argue that the records were not sufficiently confidential to constitute protected trade secrets. The courts of Oregon have recognized that the secrecy which is protected is not absolute secrecy. It is a qualified secrecy arising from mutual understanding and required by good faith and good morals. Kamin v. Kuhnau, 232 Or. 139, 374 P.2d 912, 918 (1962). There was an understanding between FPI and its divisional managers that the divisional records were to be confidentially maintained and used for limited purposes only.

■ Defendants contend that FPI gave their representatives permission to keep the records and therefore their use is not actionable. I disagree. Even if FPI intended to give the customer lists to the salesmen, that permission was not intended, and could not reasonably have been interpreted to allow removal of divisional files from division offices, delivery of them to a competitor, and a systematic exploitation of them in direct competition with FPI. Use is distinguishable from mere possession and may be actionable while possession is not. American Republic Ins. Co. v.

Union Fidelity Life Ins. Co., 470 F.2d 820, 825 n. 3 (9th Cir. 1972). The extent of the permitted use of the records may be implied, and the implication may be made as a legal conclusion recognizing the need for ethical practices in the commercial world. Kamin v. Kuhnau, 232 Or. 139, 374 P.2d 912, 919 (1962).

■ It is not the taking of the records but the use defendants made of them that constitutes unfair competition. White and Day delivered FPI files to Falcon with knowledge that they were to be used adversely to FPI. All defendants engaged in a concerted scheme to exploit the market situation, FPI's switch to "no load", and the trust shareholders had in FPI representatives. They systematically solicited shareholders identified in the records and attempted to persuade them to liquidate their holdings in the Funds.

Defendants' acts of unfair competition go beyond the exploitation of shareholder lists. In order to confuse shareholders, defendants used FPI stationery, failed to promptly remove the FPI sign at the entrance to the Portland office, and developed various techniques to disguise the fact that the defendant salesmen were representing a competitor of FPI.

These acts were done in bad faith and with full knowledge of the likely effects on FPI. Defendants' conduct exceeded the bounds of commercial morality and integrity and constituted acts of unfair competition. FPI is entitled to recover.

■ Falcon is liable for the acts of unfair competition of the individual defendants. A company which knowingly participates in, encourages, and accepts the benefits of acts of unfair competition committed by a person against his former employer is liable for those acts. American Republic Ins. Co. v. Union Fidelity Life Ins. Co., 295 F.Supp. 553, 556 (D.Or.1968).

It is upon this ground alone that the plaintiff FPI is entitled to recover. The Funds have not alleged or proved any damages resulting from defendants' acts

of unfair competition and are not entitled to recover.

## VII.

### DAMAGES

The damages schedule for lost adviser's fees includes six types of damages.

Type A consists of adviser's fees lost due to liquidation of 27 specifically identified Funds accounts that were liquidated through Falcon representatives in the Seattle and Portland areas.[1]

Type B includes fees lost on additional amounts which would have been invested by those shareholders whose liquidations are attributed to the defendants.

Type C is comprised of adviser's fees lost on amounts which, through referrals from those shareholders whose accounts were liquidated, would have been invested by third parties.

Types D, E, and F consist of adviser's fees allegedly lost by Seattle-area liquidations of unidentified accounts made through Falcon's representatives between July 11, 1972, and January 30, 1973. Type D includes fees lost on 50 percent of the total Seattle-area liquidations during the stated period, less the liquidations identified under Type A. Type E consists of fees lost on additional amounts which would have been invested by the unidentified Seattle-area shareholders whose liquidations were attributed to the defendants. Type F is comprised of adviser's fees lost on accounts which, through referrals from the unidentified Seattle-area shareholders, would have been invested by third parties.

Defendants contend that FPI has failed to prove the accuracy of the amounts claimed as lost adviser's fees.

■ Recovery for loss of future profits does not require that the amount of lost profits be proved with absolute certainty. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1926).

Losses resulting from interference with the normal course of business involve inherent difficulties in calculation. The Court, therefore, may accept something less than precise proof on the amount of loss once the fact and cause of damage have been established. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S. Ct. 574, 90 L.Ed. 652 (1945); Lehrman v. Gulf Oil Corp., 464 F.2d 26, 46 (5th Cir. 1972); Emich Motors Corp. v. General Motors Corp., 181 F.2d 70, 84 (7th Cir. 1950). However, this does not mean that the Court may award damages based on mere speculation or guesswork. Bigelow v. RKO Radio Pictures, *supra*; Lehrman v. Gulf Oil Corp., *supra*.

The proposed method of calculating damages was supplied by James O. Richards, a Vice President of FPI. Some of Richards' opinion testimony in this regard was based on data prepared by FPI employees from records of the corporation, some of it was not. Opinion testimony on the amount of loss is competent and admissible evidence in a case such as this only if it is based upon relevant supporting data. Lehrman v. Gulf Oil Corp., *supra*; Lessig v. Tidewater Oil Co., 327 F.2d 459, 473, 474 (9th Cir. 1964); Siegfried v. Kansas City Star Co., 193 F.Supp. 427 (W.D.Mo.1961). The Oregon Supreme Court has recently indicated that this rule applies in Oregon:

> "This court has adopted the rule that damages are recoverable for loss of future profits only to the extent that the evidence affords a sufficient basis for estimating the amount of such profits with reasonable certainty. [citing Douglas Construction v. Mazama Timber, 256 Or. 107, 115, 471 P.2d 768 (1970)] As stated more recently, " * * * the essential ingredient of proof of lost profits to a reasonable certainty is supporting data.'" [citing Verrett v. Leagjeld, 263 Or. 112, 501 P.2d 780 (1972)] Kwipco, Inc. v.

---

1. At time of trial, Type A damages were based on the liquidation of 35 specifically identified accounts. After trial, FPI withdrew its claims with respect to 8 of these accounts. The amount of damages originally claimed in Types A, B and C have been reduced accordingly.

General Trailer Co., Inc., 97 Or.Adv. Sh. 2210, 2213, 515 P.2d 1317, 1318 (1973).

FPI's Type B damages are based on the amount an average investor would increase his original investment. It is asserted that the amount of additional investments which can be expected from existing accounts is 20 percent of the amount originally invested. It is further asserted that the average life expectancy of an additional investment in the Funds is five years. I conclude that there is insufficient relevant data to establish the reasonableness of these estimated figures. Type B damages are therefore too speculative and cannot be recovered.

The number of lost referrals claimed under Type C damages was determined by taking 10 percent of the identified Funds accounts which were liquidated through the defendants. Richards testified that he had no data to support the 10 percent referral figure and could not tell from FPI's records if the 10 percent figure was accurate. He admitted that the estimate was based on his personal experience, which, for the most part, had been with "load" type operations (Tr. 146–147). This evidence is too speculative to form a basis for the award of Type C damages.

Plaintiffs' damages claimed under Types D, E, and F are based on unspecified liquidations totaling $162,000 allegedly traceable to the defendants. This figure was arrived at by taking 50 percent of the total Funds redemptions in the Seattle area from July 11, 1972, to January 30, 1973, other than those specifically identified under Type A. Richards testified that he had no data to support the 50 percent figure. It was merely his impression based upon the fact that the White letter had been distributed in the Seattle area (Tr. 165–166). This evidence is clearly too speculative and conjectural to form a sound basis for an award of damages. FPI is not, therefore, entitled to recover any of the damages asserted under Type D, E, and F in its damages schedule.

Type A damages consist of adviser's fees lost over a three-year period on $353,366.03, the total amount liquidated in the identified accounts through defendants. The three years is the difference between the average life expectancy of an investment in the Funds and the average age of the accounts liquidated at the date of liquidation. Since FPI's adviser's fee is computed as a percentage of the net assets of the Funds, Type A damages were determined for each of the three years of average remaining life by multiplying $353,366.03, increased in each of the three years in an amount equal to 8.4 percent of $353,366.03, by the effective percentage fee, .6389 percent. The 8.4 percent figure represents the alleged average annual unwithdrawn net percentage increase in an investment in the Funds. The totals for the three years were added together to arrive at the total Type A damage alleged.

Richards testified that the components of these equations were determined from FPI's business records. A review had been conducted under Richards' direction of the investment history of Oregon and Washington shareholders in the Financial Industrial Fund. Richards stated that, based on his knowledge and experience in the field, the figures determined by this analysis of FPI's records were reasonable.

I will allow FPI's method of calculating Type A damages. It is a reasonable method, and the individual elements of the equations are based on sufficient supporting data. However, FPI is not entitled to recover Type A damages for all of the identified liquidations.

Of the 35 liquidated accounts originally claimed, testimony was available on only eight. Five of these were withdrawn by FPI in its post-trial brief. This left testimony on only the liquidations by Mary Jelineo, Leonard Winkler, and Irene Melson.

The decisions of Jelineo and Winkler to liquidate were their own and were not influenced by any conduct of the defendants.

Irene Melson contacted White more than three years ago. She had been unable to contact her own representative, and White was the FPI Regional Manager. On several occasions she sought financial advice from White. She telephoned him twice to express concern about the declining value of her investment. White encouraged her to hold on to her shares, and she did so. After FPI's change to "no load", Mrs. Melson received the White letter. She thought it came from FPI. Thereafter she called White, redeemed her shares, and on his advice reinvested through him in Security Investors Fund.

Although Mrs. Melson had been dissatisfied with her investment for some time, I conclude that White's misleading letter was a substantial factor in her decision to liquidate. FPI is therefore entitled to recover Type A damages based on this liquidation.

I cannot assume that the other identified liquidations, for which no testimony is available, were caused by the defendants. FPI's compensatory damages must be limited to adviser's fees lost on Mrs. Melson's account.

Since only one account is involved, it is unnecessary to rely on the average age of all accounts liquidated. At the time of the liquidation, Mrs. Melson had held her shares for only two years. Based on an average life expectancy of 8.8 years, Mrs. Melson's investment had a remaining life expectancy of 6.8 years. FPI has been deprived of adviser's fees on her account for that period of time. The amount liquidated was $11,784.61. FPI is therefore entitled to recover Type A damages in the amount of $680.22, computed as follows:

Year 1

$$[(\$11,784.61 \times .084) + \$11,784.61] \times .006389$$
$$(\$989.91 + \$11,784.61) \times .006389$$
$$\$12,774.52 \times .006389 = \$81.62$$

Year 2

$$(\$989.91 + \$12,774.52) \times .006389$$
$$\$13,764.43 \times .006389 = \$87.94$$

Year 3

$$(\$989.91 + \$13,764.43) \times .006389$$
$$\$14,754.34 \times .006389 = \$94.27$$

Year 4

$$(\$989.91 + \$14,754.34) \times .006389$$
$$\$15,744.25 \times .006389 = \$100.59$$

Year 5

$$(\$989.91 + \$15,744.25) \times .006389$$
$$\$16,734.16 \times .006389 = \$106.91$$

Year 6

$$(\$989.91 + \$16,734.16) \times .006389$$
$$\$17,724.07 \times .006389 = \$113.24$$

Year 7

$$[(\$989.91 + \$17,724.07) \times .006389] \times .80$$
$$(\$18,713.98 \times .006389) \times .80$$
$$\$119.56 \times .80 = \$95.65$$

TOTAL $680.22

 FPI is not entitled to recover commissions received by defendants through the reinvestment of liquidation proceeds.

 I am convinced that defendants acted in willful, wanton, and reckless disregard of the rights of FPI. The individual defendants are therefore liable to FPI for punitive damages. American Republic Ins. Co. v. Union Fidelity Life Ins. Co., 470 F.2d 820, 826 (9th Cir. 1972). I also find that Falcon is liable for punitive damages as the result of acts of unfair competition committed by its officers, acting on its behalf.

## VIII.

### CONCLUSION

At time of trial I reserved rulings on defendants' motion for summary judgment, defendants' motion to strike Richards' testimony on damages, the admissibility of affidavits of Short and Meyers, and the admissibility of a *Wall Street Journal* article attached to defendants' Exhibit 123.

In view of this Opinion, defendants' motion for summary judgment is moot.

I have considered the signed affidavit of Short and all of the testimony offered by Richards. I have considered the *Wall Street Journal* article for the limited purpose of its possible effect on the investment community. I have not considered the unsigned affidavit of Meyers.

FPI is entitled to judgment in the amount of $680.22 as general damages and $10,000.00 as punitive damages.

Defendants are hereby permanently enjoined from using, retaining, or copying all or any portion of FPI's customer lists or lists of shareholders of the Funds, with the exception that defendants Day, White, and Fahlman are entitled to possession and reasonable use of those records which they were authorized to possess and use during their employment with FPI and which pertain solely to their own accounts.

Defendants are also permanently enjoined from contacting or soliciting any shareholder in the Funds whose identity was learned by defendants, or agents or employees of defendants, from customer or shareholder lists obtained from FPI. However, defendants Day, White, and Fahlman may contact any shareholder whose account they personally serviced while employed by FPI.

Defendants are further enjoined from representing, directly or indirectly, to any person that they, their agents or employees, or any of them, are authorized to act for, or are affiliated with, FPI or the Funds.

Defendants are further enjoined from passing off as their own any office sign, business card, promotional literature, business form, name, or other indicia or insignia similar to any used or formerly used by FPI or any of the Funds.

The impounded records which were properly possessed by defendants Day, White, and Fahlman during their employment with FPI and which pertain solely to their own accounts shall be returned to them. The remainder of the impounded records shall be delivered to FPI.

This Opinion shall serve as findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Plaintiffs shall submit a form of Judgment Order consistent with this Opinion.