200 P.3d 977

**SECURITY TITLE AGENCY, INC., an Arizona corporation, Plaintiff/Appellant–Cross Appellee,**

v.

**Linda Lorene POPE and Thomas E. Pope, husband and wife, Defendants/Appellees,**

and

**First American Title Insurance Company, a California corporation, Defendant/Appellee–Cross Appellant.**

No. 1 CA–CV 07–0272.

Court of Appeals of Arizona, Division 1, Department D.

July 29, 2008.

Review Denied Jan. 6, 2009.

Hahn Loeser & Parks LLP by Steven A. Goldfarb, Andrew S. Pollis, Cleveland, and Fennemore Craig, P.C. by Timothy Berg, Janet Weinstein, Phoenix, Attorneys for Appellant–Cross Appellee Security Title Agency, Inc.

The Cavanagh Law Firm, P.A. by Jeffrey B. Smith, Phoenix, Attorneys for Appellees Linda Lorene and Thomas E. Pope.

Bryan Cave LLP by Lawrence G. Scarborough, J. Alex Grimsley, James D. Smith, Meridyth M. Andresen, Phoenix, Attorneys for Appellee–Cross Appellant First American Title Insurance Company.

JOHNSEN, Presiding Judge.

¶ 1 At issue in this appeal are whether the superior court erred in refusing to grant judgment as a matter of law ("JMOL") to First American Title Insurance Company ("First American") on a claim for aiding and abetting a breach of fiduciary duty brought by Security Title Agency, Inc. ("Security Title") and whether the court erred in setting aside a $35 million punitive damages award against First American. We conclude sufficient evidence supports the jury's verdict and an award of punitive damages, but hold that the punitive damages award is unconstitutionally excessive and order it reduced.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Security Title's claim against First American arose out of the latter's recruitment of Linda Pope, at the time a branch manager, assistant vice president and officer of Security Title. Because our review in large part focuses on whether sufficient evidence supports the jury's finding that First American aided and abetted Pope's breach of fiduciary duty and the jury's award of punitive damages, we set out at some length the evidence presented at the seven-week trial.[1]

### A. Creation of The Talon Group.

¶ 3 First American is a title insurance company headquartered in Santa Ana, California. As of 2004, it was the second largest title insurance company in the United States. It had been the largest, but lost that ranking in 2000 to Fidelity National Financial ("Fidelity"), Security Title's parent company. Aiming at regaining the top position, First American initiated a multiple-brand strategy that involved the creation of The Talon Group ("Talon") in 2003. Talon is a division of First American that sells title insurance policies underwritten by First American. First American hired Bill Halvorsen as Talon's president and James Clifford and Nick Velimirovich as senior vice presidents of Tal-

---

1. Much of the evidence presented by Security Title in support of its claims was disputed by First American; however, we view the evidence in the light most favorable to sustaining the jury's verdict. *See S Dev. Co. v. Pima Capital Mgmt. Co.,* 201 Ariz. 10, 18, ¶ 16, 31 P.3d 123, 131 (App.2001).

on and vice presidents and officers of First American. Clifford and Velimirovich were designated co-managers "of Arizona for Talon."

¶ 4 Halvorsen created a Business Plan/Executive Summary (the "Business Plan") for Talon. The Business Plan outlined First American's objectives and strategies with regard to Talon:

> Build an operation that will offer traditional title insurance customers and agents a new and self-competitive brand.... While national in scope, it will operate only in the top real estate markets and only in segments where it can quickly establish share and profit. It will depend heavily on the recruitment of people who can influence business decision makers.

Because the title insurance industry is a "relationship business," the Business Plan called for hiring key people from other title insurance companies who had relationships with key customers and other key employees. According to Clifford, Pope was such a key person; she managed a Security Title office that was one of the largest and most successful title insurance branches in the industry.

### B. First American's Recruitment of Pope and Pope's Solicitation of Security Title's Employees.

¶ 5 It was Clifford's idea to recruit Pope for Talon, and he was the one primarily responsible for doing so. He first met with Pope on August 26, 2003. Clifford learned from Pope that the branch Pope ran, called Branch 66, had annual revenue of $8 million. In a deposition excerpt read to the jury, Clifford testified he thought that in order for that revenue to transfer from Branch 66 to Talon, Pope would have to bring most of the branch's employees with her. He testified he had hoped that many other Branch 66 employees "would want to come with" Pope.

¶ 6 Shortly after her first meeting with Clifford, Pope arranged for him to meet with four of her senior employees, Nyla Tarpley, Branch 66's marketing director, and three department heads, Amy Osborn, Patti Brittain and Debbie Tucker, who also was the assistant branch manager. According to Clifford, it was Pope's idea to set up the

meetings, and she attended all of them except for the one with Tarpley.

¶ 7 Tucker testified at length about her first meeting with Clifford, which took place on September 10. *Over drinks and dinner,* Clifford described Talon in terms that interested Tucker; she felt that Clifford was recruiting her to join the new company. Tucker testified that Pope had related she was planning on all of the Branch 66 employees, approximately 40 persons, going with her to Talon. As the dinner discussion continued, Clifford "came up with the idea of leaving in waves." Under that arrangement, Pope and Tucker would leave to join Talon first; department heads then would give their two weeks' notice and after they left, their assistants in turn would depart. Tucker testified that Clifford explained that the employees could not leave all at once because they "needed to make it look proper and doing it the correct way." Clifford said he "[w]anted to make it look right," Tucker testified. On her way home from their dinner meeting with Clifford, Tucker spoke by cell phone with Pope and told her that she would commit to go with her to Talon.

¶ 8 After that, Pope actively involved Tucker in the preparations to move to Talon. At Pope's direction, Tucker arranged for employees to begin organizing their desks and files in anticipation of the move. In the third or fourth week of September, Tucker accompanied Pope to visit an office site Talon was considering leasing for the new group. At Pope's request, and using a list of Branch 66 employees, Tucker marked up a set of plans for the new office to show where each of the various employees would sit. Tucker testified that she returned the marked-up plans to Clifford during a lunch on September 30.

¶ 9 From time to time in September and early October, Tucker testified, Pope called department-head meetings at which she discussed the move to Talon. Pope showed the department heads (there were ten to 15 of them) a written comparison prepared by Clifford's assistant at Talon showing that employees could obtain health benefits for less at Talon than at Security Title. More generally, Tucker testified, Pope "would try to get us excited and anxious about making the

move. She would tell us how much better it was going to be, how much better the computer system would be, the benefits would be. So she, in turn, would—kind of recruit[ ] us."[2]

¶ 10 Tucker also testified that at Pope's direction, she located a form to be used by buyers and sellers to move their escrow files from one title company to another. At Pope's direction, she and the five escrow officers in the office prepared forms directing Security Title to transfer escrow files to Talon.

¶ 11 Meanwhile, Pope continued to seek commitments from other Branch 66 employees to go with her to Talon. Tarpley testified that shortly after Pope first met with Clifford, Pope arranged a lunch meeting so that Tarpley could meet Clifford. She testified that Clifford tried during lunch to recruit her for Talon, saying that whatever marketing tools she needed would be available for her at the new company.

¶ 12 Tarpley testified that soon after her August 29 lunch with Clifford, Pope directly asked her to commit to going with her to the new company: "She wanted me to go with her, yes. She wanted a commitment." Tarpley told Pope she would commit if she could bring her assistant with her, and Pope agreed. Tarpley testified that Pope told her the move would be "financially well worth it" for all the employees and asked her how "$5,000 a month sound[ed]." Later, Tarpley testified, Pope acknowledged to her that Pope "could get in trouble for talking to us about the new company and trying to recruit us." Thereafter, Pope adopted the habit of referring to Talon as the "new hospital" and Security Title as the "old hospital."[3]

¶ 13 Another department head, Joyce Westfall, testified that Pope called her into her office and asked her if she would go with Pope if Pope took a position with a different company. Westfall said yes. The jury heard deposition testimony in which Westfall testified that Pope told her she would have a job at the new company if she followed her. Westfall also testified that one day in early October she heard the "old hospital"/"new hospital" code used at a meeting of ten or 15 department heads, and that everyone seemed to know what was being talked about.

¶ 14 Gilda Ruiz, another Branch 66 employee, testified that in early October, Pope told her she was leaving Security Title and going to work for a different company and that Ruiz could go with Pope. Pope told her during this conversation that Ruiz would make more money, would get a signing bonus and would have better benefits at the other company. Pope also told Ruiz that she was taking the Fulton Homes account with her.[4]

¶ 15 The jury also heard deposition testimony in which Pope acknowledged she discussed her departure plans during Branch 66 department-head meetings. Pope also testified that between the two of them, she and Tucker talked to most of the Branch 66 employees about moving and they all agreed to go with them to Talon.

¶ 16 After her initial meetings with Clifford, Pope wanted to meet with other First American executives. Halvorsen, Talon's president, therefore scheduled a meeting in Santa Ana for September 16. In anticipation of that meeting, Halvorsen sent an email to First American's president, Gary Kermott, calling Pope "a very significant recruit" who "controls $8,000,000 in revenue." Halvorsen wrote, "She is with Security Title and would be a major coup for us (or blow to Fidelity)."

¶ 17 Also in preparation for the meeting, Clifford emailed a document titled "Executive Summary Linda Pope" (the "Executive Summary") to Halvorsen and to Steven Veltri, Talon's western division manager and a vice president of First American. Clifford wrote in the Executive Summary that Branch 66 had 44 employees and that Pope

---

**2.** Tucker later had additional meetings with Clifford, including a one-on-one meeting on October 3, in which he told her that there would be signing bonuses for employees who joined Talon. Tucker said that Pope already had told her and other department heads that signing bonuses would be awarded.

**3.** Pope referred to Talon management as "the new doctors" and Security Title management as "the old doctors."

**4.** At the time, Fulton Homes constituted approximately 30 percent of Branch 66's business.

believed "nearly all of them" would want to join her at Talon. He noted, however, that Pope was "hesitant to discuss anything with any of them for fear of violating her fiduciary function as an officer of Security Title." He also concluded that "[t]he hiring of [Pope] and her staff would be an enormous coup" for Talon.

¶ 18 Clifford and Halvorsen met with Pope in Santa Ana on September 16. Halvorsen testified that at that meeting he and Pope talked about her purported hesitancy to discuss with Branch 66 employees her plan to leave Security Title for Talon due to a concern that she would violate her fiduciary duty to Security Title. In Clifford's presence, Halvorsen told Pope she should not discuss her plans with the Branch 66 employees.

¶ 19 Kermott met with Pope, Clifford, Veltri and Velimirovich in Phoenix the following day. Kermott testified that during the meeting, he told Pope that "she should not and it was not First American's policy to recruit others within the company while she worked for that company." When Pope expressed concern that Security Title might sue her for leaving, the First American executives told her, "We can't prevent you from being sued." Later that day, Kermott arranged a conference call with Pope and an outside attorney, who testified that he told Pope she should not tell her employees or customers that she was leaving prior to her announcing her resignation. According to Veltri, the conversation with the outside attorney left Pope scared, "in a dither" and upset about the prospect of being sued by Security Title. Halvorsen testified that he was concerned Pope had been "scared ... into a position where she would just shut down and not continue discussions."

¶ 20 After the phone call with the outside counsel, Pope spoke privately to Clifford about her fear of being sued. Clifford reassured her by telling her that First American would indemnify her "against anything." In an email sent shortly after the call with the lawyer, Halvorsen asked Veltri if they had "repaired the outside counsel damage."

Based on what he had heard from Clifford about Pope's frame of mind after Clifford's separate conversation with Pope, Veltri replied, "Yes."

¶ 21 Consistent with Clifford's assurance to Pope, two days after the call with the lawyer, Veltri sent an email to Kermott and Halvorsen attaching an employment letter for Pope that contained an indemnification clause. The letter provided that "[t]o the extent permitted by law, an [sic] its articles of incorporation and bylaws, [First American] shall indemnify and hold [Pope] harmless for any acts or decisions made in good faith while performing services for" First American. Before the draft letter was given to Pope, however, Veltri and Kermott decided on September 24 to broaden the indemnification to also encompass "any acts or decisions made in good faith ... in conjunction with joining" First American.[5] Thus, under the revised letter agreement, Pope would be indemnified for "good faith" acts taken while still employed by Security Title "in conjunction with joining First American."

¶ 22 The evidence also demonstrates that during September and October, Clifford made commitments to Pope regarding signing bonuses and guaranteed commissions for her and the other Branch 66 employees who joined Talon. He agreed that if Pope joined Talon, First American would give her a $200,000 signing bonus. At Pope's request, he also committed to make an additional $300,000 available to her to use as signing bonuses for the Branch 66 employees who chose to follow her. Additionally, he agreed that First American would provide guaranteed commissions for Pope and all of the Branch 66 employees who joined Talon.

¶ 23 The evidence further demonstrates that Clifford knew, prior to October 20, which Branch 66 employees had agreed to leave with Pope. Clifford testified that sometime after he met with Tarpley, Osborn, Brittain and Tucker, but before October 20, Pope told him she had talked to those four employees and she was confident they would move to Talon with her. Clifford also testified

5. Clifford testified that the only version of the employment letter he gave Pope had the second, broader indemnification clause.

that, prior to October 20, Pope gave him a list containing the names of the Branch 66 employees who were joining Talon, the salary Pope wanted to pay those employees, and the employees' titles and positions.

## C. First American's Preparations to Open Talon's New Branch.

¶ 24 While Pope was recruiting Branch 66 employees to go with her to Talon, Clifford and First American hurriedly worked to prepare an office that could accommodate Pope and all of the Branch 66 employees. The fact that the office was being opened was kept confidential, even, to the extent possible, within First American.

¶ 25 On September 18, Clifford sent an email to a First American employee stating that if First American could not set up the office "quickly enough, we will not be successful in our recruiting efforts to an office that does nearly $8 mil[lion] in revenue annually." In another email a few days later about obtaining an office site, Clifford advised that the person being hired "has a staff of 44 people and an annual revenue of $8 [m]illion." Clifford stated there was a need for "an immediate location for them to arrive at [Talon] and actually be able to perform [escrow] closings."

¶ 26 Talon/First American management approved purchase orders for furniture and computer rentals for an office of 49 persons to be available by October 16. On October 16, First American's technology manager emailed an "employee list" of the Branch 66 employees stating that "[t]he attached list contains all of the users that will soon join the Talon team. This could happen at anytime within the next week or two." The manager instructed that email accounts be created for all the new Talon employees on the list and stated, "NOTE!!! We need to 'hide' all of these recipients in the [global address book] (potential political repercussions)." The names of the prospective employees came from Clifford.

## D. Security Title's Termination of Pope and Pope's Organization of the Walkout.

¶ 27 Patti Madden, a Security Title vice president, testified that around October 10, she began to suspect that Pope was planning to leave Security Title. Madden spoke about her concerns to Leroy Schneider, Security Title's former owner, who continued to consult for the company, and other company officials. They decided to terminate Pope and offer her manager's position to Tucker.

¶ 28 During the weekend of October 18, Madden and Bill Witt, another Security Title vice president, dropped in unexpectedly on Tucker, who was vacationing in Mexico. They told her they knew Pope was planning to leave and that they were going to "walk ... Pope out" of Security Title on Monday, October 20. They asked Tucker to stay at the company and succeed Pope as branch manager. Tucker testified that at first she did not want to accept the position because she knew Pope would "take care" of her and also because Pope had told the Branch 66 employees "that if she [Pope] ever left Security Title," she would "take all the business and she would be sorry for whoever was left standing." Later that weekend, however, Tucker reconsidered, and on Sunday, October 19, Tucker accepted the new job.[6]

¶ 29 The jury heard Pope's deposition testimony that, alerted to the fact that Security Title was aware of her planned move, she telephoned Branch 66 employees on Saturday and Sunday of that weekend and told them, "I'm being walked out or fired tomorrow, and ... if you're with me, walk out with me; if you're not, good luck."[7] Pope said in

---

6. Tucker telephoned Pope that weekend and told her that Madden and Witt had approached her and that she was considering accepting their offer. Tucker testified that Pope became angry and said, "I thought this would happen. You are the weakest link."

7. Pope testified that she made a mistake in her deposition and that she did not say "walk out" when she talked to the Branch 66 employees.

Rather, she said, "[I]f you're with me, walk with me; if you're not, good luck." She testified that "walk with me" meant the employees "were still in [her] spirits" and "[i]f [they] wanted to have a home, [they] would have a home with" her and "[i]f [they] didn't, good luck." The jury was free to adopt Pope's version of events as related in her deposition. *See State v. Romero*, 178 Ariz. 45, 51, 870 P.2d 1141, 1147 (App.1993) (jury

her deposition that her purpose in calling the employees was to ask them to join her and to let them know "they would have a place ... with [her] after [she] had been walked out." Tarpley testified that Pope called her that Sunday and said, "[I]f you['re] with me, and you support me, when I get walked out, walk out with me and wear red."[8] Ruiz testified that Osborn called her that Sunday and told her that Pope was getting fired the next day, all the employees were leaving with Pope, and she asked Ruiz if she would wear red in support of Pope.

¶ 30 On Monday morning, October 20, Schneider came to Branch 66 to see Pope. After speaking with her, Schneider asked Westfall, Osborn and Brittain if they were going with Pope, and they all said yes. Schneider then escorted the four women out the door.

¶ 31 Madden testified that she and other Security Title administrators went to Branch 66 on the morning of October 20 to talk to the employees and try to convince them to stay. Once there, Madden saw Pope standing at the end of the hallway motioning for employees to follow her. Madden testified that she heard Pope say to the employees, "Come on." Madden said she and the other administrators asked the employees to stay, but the employees handed over their keys and walked out. Approximately 35 Branch 66 employees walked out that morning. Madden testified that with the exception of Pope, none of them was terminated.

¶ 32 Pope and the other Branch 66 workers gathered across the street, then moved to another restaurant a few miles away, where Velimirovich met them. Tarpley testified Velimirovich told the group "he was real proud of all [the employees for] standing up with [Pope] and having the guts to walk out, [and] that they were all going to be getting a raise and a walking bonus for doing it."

¶ 33 After buying lunch for the Branch 66 employees, Pope and Velimirovich then sat down with them one-by-one and presented each with his or her new job title, monthly salary and bonus. For example, Tarpley, who was making $3,500–$4,000 a month at Security Title, was told she would make $5,000 monthly at Talon and would receive a signing bonus of $26,250.

¶ 34 Two days later, on October 22, Velimirovich again met with the employees and gave each an identical two-line letter to sign concerning the conditions under which they had left Security Title. According to Tarpley, Velimirovich explained the letters by saying that there might be a question about whether the employees "were still technically employed by Security Title. So in order to clarify that, they had this, and everybody signed it." The letters were addressed to Security Title and stated simply, "Pursuant to the ultimatum I received on October 20, 2003, this letter is to confirm my employment was terminated on October 20, 2003." Tarpley conceded at trial that the letter she signed was false because she had received no ultimatum from Security Title. In fact, she testified that when she returned to Security Title the afternoon of October 20 to pick up an appointment book, Witt encouraged her to stay at Security Title. Westfall likewise testified that she was not terminated by Security Title and that she never heard anyone say "you're fired" to anyone else that day.

¶ 35 Tucker testified that the employees walking out left Branch 66 in a state of "chaos." She testified the departures led to the loss of customers and business, and that Branch 66 lost approximately 70 percent of its revenue immediately thereafter.

### E. Pope's Solicitation of Security Title's Customers and Copying of its Files.

¶ 36 Before Pope left Security Title, she told four Security Title customers she was thinking of leaving the company. She testified she spoke to Ira Fulton with Fulton Homes and asked him, "[I]f I can give you

---

may choose to believe a witness's prior statements even though the prior statements conflict with the witness's trial testimony).

**8.** *Pope testified she thought it would be a "nice gesture"* if the Branch 66 employees wanted to show their support for her by wearing red shirts to work on October 20. So she stopped on her way to work that morning to buy red t-shirts for the employees.

better service elsewhere, how do you feel about that?" She asked the same question of the other three customers. At some point before Pope left Security Title, she told Clifford that she had talked to Mr. Fulton and she was confident that his business was going to follow her.[9]

¶ 37 Pope directed Tucker to have pending escrow files copied so they could be moved to Talon. Tucker testified that after the files were copied, Pope recommended that the employees take them to their homes so Security Title would not discover them. Clifford testified that he learned of the copying only after Pope had left Security Title.

### F. Trial Proceedings.

¶ 38 Security Title filed a complaint against Pope and First American, asserting, *inter alia*, that Pope had breached her fiduciary duty and that First American aided and abetted Pope's breach.

¶ 39 The case first went to trial in October 2005, but the court granted a mistrial on disclosure grounds. The jury in the second trial, which commenced in April 2006, found that Pope breached her fiduciary duty to Security Title and that First American aided and abetted Pope's breach. The jury awarded Security Title $6.3 million in compensatory damages, finding Pope's and First American's relative degrees of fault to be 3.17 percent and 96.83 percent, respectively. The jury also awarded Security Title $35.2 million in punitive damages, assessing $35 million against First American and $200,000 against Pope.

¶ 40 Following motions for JMOL or, in the alternative, motions for a new trial filed by First American and Pope, the superior court set aside the jury's award of punitive damages against First American and affirmed the jury's verdict in all other respects. Security Title appeals the setting aside of the $35 million punitive damages award, and First American cross-appeals the superior

court's denial of its JMOL on the aiding-and-abetting claim.[10] We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

### DISCUSSION

### A. The Aiding–and–Abetting Jury Instructions Did Not Constitute Reversible Error.

#### 1. Standard of review.

¶ 41 First American argues the jury instructions were erroneous because they did not state the proper scienter and causation requirements for an aiding-and-abetting claim.

¶ 42 The superior court gave the following instruction on the aiding-and-abetting claim:

Security Title has the burden of proving that:

... Pope breached her fiduciary duty to Security Title causing damages to Security Title;

First American had knowledge or a general awareness that ... Pope's conduct constitutes a breach of fiduciary duty; and[ ]

First American provided substantial assistance or encouragement to ... Pope in the achievement of her breach. Substantial assistance means that First American, by its conduct, made it easier for ... Pope to breach her fiduciary duty.

To satisfy the knowledge and general awareness element of an aiding and abetting claim, Security Title must prove that First American either had actual knowledge of ... Pope's alleged wrong doing or had a general awareness of ... Pope's conduct. The knowledge and general awareness element can be met even though First American may not have known all the details of ... Pope's breach of fiduciary duty and can be established through circumstantial evidence.

---

9. Tucker testified that sometime in September, Pope related to her that she had talked with Mr. Fulton and "that she got a commitment from him to transfer the business after she made the move." Fulton Homes business did indeed follow Pope to Talon.

10. Pope also filed a cross-appeal, which she later dismissed.

Security Title must show that First American provided substantial assistance to ... Pope to breach her fiduciary duty. Substantial assistance means that First American's actions must have been a substantial factor in making it easier for ... Pope's alleged breach of fiduciary duty.

Before you can find First American liable ... for the aiding and abetting breach of fiduciary [duty] claim, you must find that First American's aiding and abetting was the cause of harm to Security Title. Aiding and abetting a breach of fiduciary duty is a cause of harm and/or damages if it helps produce the damages and if the damages would not have occurred without the breach.

¶ 43 We review jury instructions "as a whole with an eye toward determining whether the jury was given the proper rules of law to apply in arriving at its decision." *Thompson v. Better–Bilt Aluminum Prods. Co.*, 187 Ariz. 121, 126, 927 P.2d 781, 786 (App.1996). A "verdict will not be overturned as a result of improper jury instructions unless there is substantial doubt as to whether the jury was properly guided in its deliberations." *Id.*

### 2. Knowledge requirement.

¶ 44 "Arizona recognizes aiding and abetting as embodied in" Restatement of Torts (Second) ("Restatement of Torts") § 876(b) (1979). *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 485, ¶ 31, 38 P.3d 12, 23 (2002). A claim for aiding and abetting a tort requires proof that (1) the primary tortfeasor has committed a tort causing injury to the plaintiff; (2) the defendant knew the primary tortfeasor breached a duty; (3) the defendant substantially assisted or encouraged the primary tortfeasor in the breach; and (4) a causal relationship exists between the assistance or encouragement and Pope's breach. *Id.* at ¶ 34; Restatement of Torts § 876 cmt. d.

¶ 45 First American argues the jury should have been instructed that Security Title was required to prove First American had actual knowledge of Pope's breach. That argument is without merit. To be sure,

"[b]ecause aiding and abetting is a theory of secondary liability, the party charged with the tort must have knowledge of the primary violation, and such knowledge may be inferred from the circumstances." *Id.* at ¶ 36. Proof of "actual and complete knowledge" of the primary violation "is not uniformly necessary," however. *Id.* at 488, ¶ 45, 38 P.3d at 26. The knowledge requirement can be satisfied even though the aider and abettor did not know all the details of the primary violation. *Id.* (" 'The knowledge requirement' can be met, 'even though the [defendant] may not have known of all the details of the primary fraud ....' " (quoting *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.,* 219 F.3d 519, 536 (6th Cir.2000))).

¶ 46 Thus, by informing the jury that Security Title had the burden of proving First American had "actual knowledge" of Pope's breach or had "a general awareness of ... Pope's conduct," the court properly instructed the jury on the law. *See Dawson v. Withycombe,* 216 Ariz. 84, 102, ¶ 50, 163 P.3d 1034, 1052 (App.2007) ("[T]he knowledge requirement may be satisfied by showing general awareness of the primary tortfeasor's fraudulent scheme.").

### 3. Causation requirement.

¶ 47 An aiding-and-abetting claim requires proof of a causal connection between the defendant's assistance or encouragement and the primary tortfeasor's commission of the tort, although "but for" causation is not required. *See Wells Fargo,* 201 Ariz. at 489, ¶ 54, 38 P.3d at 27 ("The test is whether the assistance makes it 'easier' for the violation to occur, not whether the assistance was necessary."); Restatement of Torts § 876 cmt. d ("If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.").

¶ 48 First American argues the superior court erroneously "eliminated any notion of causation" by "equating 'made it easier' with 'substantial assistance.' " The court instructed the jury that "[s]ubstantial assistance means that First American's actions must have been a substantial factor in making it

easier for ... Pope's alleged breach of fiduciary duty." The court also told the jury, however, that before it could find in Security Title's favor on the aiding-and-abetting claim, it had to find that the aiding and abetting was the cause of harm to Security Title, and instructed that aiding and abetting is a cause of harm if it "helps produce the damages and if the damages would not have occurred without the breach."

¶ 49 In sum, the jury was instructed that in order to find in Security Title's favor, it was required to find that (1) but for Pope's breach, Security Title's damages would not have occurred and that (2) First American's aiding and abetting helped produce those damages. We conclude that based on these instructions, the jury necessarily by its verdict found that First American's aiding and abetting was a cause of Pope's breach.

### B. The Court Properly Denied First American's Motion for JMOL.

¶ 50 We next address First American's argument that the superior court should have granted it JMOL on Security Title's aiding-and-abetting claim.

#### 1. Standard of review.

¶ 51 We review de novo a superior court's ruling on a motion for JMOL. *Shoen v. Shoen,* 191 Ariz. 64, 65, 952 P.2d 302, 303 (App.1997). The superior court properly grants JMOL "only if the facts presented in support of a claim have so little probative value that reasonable people could not find for the claimant." *Id.* We view "the evidence in a light most favorable to upholding the jury verdict" and will affirm "if any substantial evidence exists permitting reasonable persons to reach such a result." *Hutcherson v. City of Phoenix,* 192 Ariz. 51, 53, ¶ 13, 961 P.2d 449, 451 (1998).

#### 2. Sufficient evidence supports the conclusion that Pope breached her fiduciary duty by improperly soliciting Security Title's employees.[11]

¶ 52 As noted, in order for the jury to find for Security Title on its aiding-and-

abetting claim, it first was required to find that Pope breached her fiduciary duty to Security Title. *See Wells Fargo,* 201 Ariz. at 485, ¶ 34, 38 P.3d at 23. Sufficient evidence supports a conclusion that Pope breached her fiduciary duty by improperly soliciting Security Title's employees.

¶ 53 "[I]n Arizona, an employee ... owes his or her employer ... a fiduciary duty," which includes a duty of loyalty. *McCallister Co. v. Kastella,* 170 Ariz. 455, 457–58, 825 P.2d 980, 982–83 (App.1992). Consistent with the fiduciary duty of loyalty, an employee may not, absent agreement to the contrary, statute or other authority, compete with his or her employer concerning the subject matter of the employment. *See id.* (citing Restatement (Second) of Agency ("Restatement of Agency") § 393 (1958)). Nevertheless, an employee may "make arrangements to compete." Restatement of Agency § 393 cmt. e. Thus, the question Security Title's claim presented was whether Pope's actions constituted a breach of her fiduciary duty or "were merely legally permissible preparations to compete." *Jet Courier Serv., Inc. v. Mulei,* 771 P.2d 486, 493 (Colo.1989).

¶ 54 "[T]he line separating mere preparation from active competition may be difficult to discern in some cases." *Id.* (quoting *Md. Metals, Inc. v. Metzner,* 282 Md. 31, 382 A.2d 564, 569 n. 3 (App.1978)). In determining whether a breach occurred, we focus on the nature of the defendant's preparations to compete. *See Bancroft–Whitney Co. v. Glen,* 64 Cal.2d 327, 49 Cal.Rptr. 825, 411 P.2d 921, 935 (1966). Moreover, whether an employee's actions constitute a breach of the fiduciary duty of loyalty is a question of fact to be decided by the trier of fact "based on a consideration of all the circumstances of the case." *Jet Courier,* 771 P.2d at 494.

¶ 55 An employee may not solicit co-workers to join a competing business.

---

11. Because we find that sufficient evidence supports the conclusion that First American aided and abetted Pope's improper solicitation of Security Title's employees, we do not reach Security Title's arguments that First American also aided and abetted Pope in improperly soliciting Security Title's customers and disclosing its confidential information.

*See, e.g., McCallister,* 170 Ariz. at 457–58, 825 P.2d at 982–83; *Jet Courier,* 771 P.2d at 494; Restatement of Agency § 393 cmt. e. We agree with the Colorado Supreme Court in *Jet Courier* that in deciding whether an employee impermissibly solicited co-workers, the trier of fact "should consider the nature of the employment relationship, the impact or potential impact of the employee's actions on the employer's operations, and the extent of any benefits promised or inducements made to co-workers to obtain their services for the ... competing enterprise." 771 P.2d at 497.[12] "No single factor is dispositive...." *Id.*

¶ 56 Citing *McCallister* and *Motorola, Inc. v. Fairchild Camera & Instrument Corp.,* 366 F.Supp. 1173 (D.Ariz.1973), First American argues a reasonable jury could not have found that Pope breached her fiduciary duty by improperly soliciting Security Title's employees to join Talon. The defendant in *McCallister* informed her co-workers that she intended to resign and start her own competing company. 170 Ariz. at 458, 825 P.2d at 983. The defendant testified that she did not offer jobs to the employees, but that when they asked her if they could work for her, she told them "that would be fine if the new company 'got up and running.'" *Id.* Six employees resigned and went to work for the defendant at her new company. *Id.* On appeal, the court cited the factors listed in *Jet Courier* and concluded that as a matter of law, the evidence did not show the defendant had solicited co-workers. *Id.* at 459–60, 825 P.2d at 984–85.

¶ 57 In *Motorola,* the individual defendants terminated their employment and joined a competitor of their former employer. 366 F.Supp. at 1177–78. Prior to resigning, one of the individual defendants, Hogan, discussed with co-employees his plan to leave, "seeking their advice." *Id.* at 1177. Hogan "refused to discuss employment with any of them but did give them, at their request," contact information for the company he was to join. *Id.* Hogan also gave the new company the names of the employees who had asked for contact information. *Id.* On their own, some of those employees contacted the

competing company, applied "and negotiated their own deal for compensation." *Id.* at 1177–78. Hogan's former employer alleged that he and the other employees breached their fiduciary duty by "leaving as a 'group'" to join the other company. *Id.* at 1181. After an eight-week trial, the court entered judgment for the defendants, finding no breach of fiduciary duty. *Id.* at 1182–83.

¶ 58 First American contends that in this case Pope, like the defendants in *McCallister* and *Motorola,* was merely preparing to compete with Security Title when she concededly "communicated with several co-workers about her potential move." First American also asserts that although the jury instruction required proof that Pope made a "job offer" to a Security Title employee while she was still employed there, "[n]ot a single witness testified that Pope made any such job offer while in [Security Title's] employ."

¶ 59 We are not persuaded that in order to be found liable for breach of fiduciary duty for soliciting a co-worker, Arizona law requires proof that the defendant made an express job offer to the co-worker. Rather, the nature and substance of the defendant's communications with the co-workers she is accused of soliciting are among the considerations encompassed in the third factor we adopt from *Jet Courier:* "the extent of any benefits promised or inducements made to co-workers to obtain their services for the ... competing enterprise." 771 P.2d at 497. Although we acknowledge that "[t]he limits of proper conduct with reference to securing the services of fellow employees are not well marked," Restatement of Agency § 393 cmt. e, we conclude that a manager breaches her fiduciary duty by encouraging or inducing her employees to terminate their employment and join a competing company. *See Bancroft,* 49 Cal.Rptr. at 840, 411 P.2d at 936 (manager breached his fiduciary duty as a matter of law when he "obtain[ed] for a competitor those of plaintiff's employees whom the competitor could afford to employ and would find useful"); *ABC Trans Nat'l Transp., Inc. v. Aeronautics Forwarders, Inc.,* 90 Ill.App.3d 817, 46 Ill.Dec. 186, 190–

---

**12.** The superior court in this case instructed the jury to consider those three factors.

92, 413 N.E.2d 1299, 1303–05 (1980) (managers breached their fiduciary duties by enticing co-workers away from their employer); *Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 565 N.E.2d 415, 417 (1991) (manager breached duty of loyalty when he "secretly solicited key managerial employees" to join a competing company).

¶ 60 In *Bancroft*, the corporate plaintiff and the corporate defendant, Bender, were publishing companies. 49 Cal.Rptr. at 828, 411 P.2d at 924. Glen was plaintiff's president and editor-in-chief. *Id.* at 830, 411 P.2d at 926. The evidence demonstrated that Bender recruited Glen from the plaintiff company and that Glen, in turn, recruited editors whom he managed by offering them employment contracts, raises and a percentage of the profits at the new company. *Id.* at 831–33, 411 P.2d at 927–29. The court stated that "[t]he undisputed evidence show[ed] a consistent course of conduct by [Glen] designed to obtain for a competitor those of plaintiff's employees whom the competitor could afford to employ and would find useful." *Id.* at 840, 411 P.2d at 936. Thus, the court held that Glen had violated his fiduciary duty to plaintiff "as a matter of law." *Id.*

¶ 61 The corporate plaintiff and defendant in *ABC Trans* were competing transport firms. 46 Ill.Dec. at 189–90, 413 N.E.2d at 1302–03. The individual defendants were key management employees of the plaintiff who organized a competing firm and, prior to resigning their positions with the plaintiff, persuaded other employees to "walk out en masse" and join them at the competing firm. *Id.* at 190–93, 413 N.E.2d at 1303–06. More than half of the plaintiff's employees resigned and joined the competing firm. *Id.* at 190, 413 N.E.2d at 1303. The court described the individual defendants as "key management employees of [plaintiff] who were actively promoting the interests of [the competing firm] while still employed by" the plaintiff. *Id.* at 193, 413 N.E.2d at 1306. The court recognized that "one under a fiduciary duty breaches the [duty] if he ... entices co-workers away from his employer" and held that the individual defendants were liable to

plaintiff for breach of their fiduciary duties. *Id.* at 192–93, 413 N.E.2d at 1305–06.

¶ 62 The plaintiff and defendant in *Augat* manufactured microcircuit packages. 565 N.E.2d at 416. The defendant recruited Greenspan, who was the plaintiff's vice president and general manager. *Id.* Greenspan "discussed his plan" to leave plaintiff's employ and join defendant with four employees "who held important senior managerial positions" at the plaintiff company. *Id.* Three of the four employees terminated their employment with the plaintiff and joined defendant. *Id.* Recognizing the principle that "before he terminates his employment, a top managerial employee may not solicit the departure of employees to work for a competitor," the court affirmed the trial court's ruling that Greenspan violated his duty of loyalty when "he secretly solicited key managerial employees to join" the defendant. *Id.* at 417, 420.

¶ 63 We conclude that under these authorities, substantial evidence supports a conclusion that Pope breached her fiduciary duty by improperly recruiting Security Title employees for Talon while she was still employed by Security Title. First American's argument that Pope merely discussed her plans with the other employees and was only preparing to compete with Security Title flies in the face of a wealth of evidence presented to the jury. First American relies on *Motorola*, but the defendant in that case merely discussed with co-workers his plan to join a competing company and gave the competing company's contact information to those who asked for it. Indeed, the defendant in that case refused to discuss with his co-workers their own possible employment at the competing company. 366 F.Supp. at 1177. By contrast, Pope, like the defendants in *Bancroft*, *Augat* and *ABC Trans*, secretly solicited key managerial employees to join a competitor. She arranged for Clifford to help her recruit key Security Title employees and enticed other Branch 66 employees to leave Security Title by telling them about Talon's "beneficial" compensation, signing bonuses, medical benefits and superior computer system. We conclude the evidence easily supports the conclusion that Pope breached her fiduciary duty by improperly recruiting Secu-

rity Title's employees for Talon while she was still employed by Security Title.

### 3. Sufficient evidence supports the conclusion that First American aided and abetted Pope in breaching her fiduciary duty.

¶ 64 In order to prove that First American aided and abetted Pope's breach, Security Title also was required to prove (1) First American knew Pope's conduct constituted a breach of her fiduciary duty; (2) First American substantially assisted or encouraged Pope in the achievement of her breach; (3) a causal relationship between the assistance or encouragement and Pope's breach; and (4) Pope's breach injured Security Title. *See Wells Fargo,* 201 Ariz. at 485, 489, ¶¶ 34, 54, 38 P.3d at 23, 27; Restatement of Torts § 876 cmt. d.

¶ 65 First American contends Security Title failed to prove it knew that Pope was wrongfully soliciting Security Title's employees. The evidence shows otherwise. *See Wells Fargo,* 201 Ariz. at 488, ¶ 45, 38 P.3d at 26 (knowledge requirement may be met even though the one alleged to have aided and abetted a tort did not know "of all the details" of the tort (quoting *Aetna Cas.,* 219 F.3d at 536)); *cf. Dawson,* 216 Ariz. at 102–03, ¶¶ 51–52, 163 P.3d at 1052–53 (no evidence defendants were aware of fraudulent scheme they were alleged to have aided and abetted).

¶ 66 To begin with, the jury reasonably could have concluded that Clifford and other First American executives knew Pope owed a fiduciary duty to Security Title and knew Pope would breach the duty if she improperly solicited Security Title's employees. The jury also reasonably could have concluded that First American knew Pope was improperly soliciting Security Title's employees because, *inter alia,* before she left Security Title, Pope told Clifford which employees she was bringing with her. As noted, Pope even provided Clifford with the salary Talon should pay each employee and what position each should receive. Clifford also knew that Pope was improperly soliciting employees be-

cause he participated in recruiting meetings Pope arranged with key employees. The jury reasonably could have found that Pope's purpose in setting up those meetings was to permit Clifford to assist her in persuading those employees to come with her to Talon.

¶ 67 First American also argues the evidence does not support a conclusion that it substantially assisted Pope's breach or that there was a causal relationship between its assistance or encouragement and Pope's breach. It asserts that "[a]ny 'inference' that First American encouraged Pope to solicit employees improperly can be based on nothing more than rank speculation." We are not persuaded. *See Wells Fargo,* 201 Ariz. at 489, ¶ 48, 38 P.3d at 27 (recognizing that "ordinary course transactions" may constitute substantial assistance in some circumstances, as when "there is an extraordinary economic motivation to aid").

¶ 68 The jury reasonably could have concluded that Clifford, on behalf of First American, substantially assisted Pope to solicit key Security Title employees by participating in recruiting meetings arranged by Pope. The jury could have found that Clifford's recruiting pitches assisted Pope to obtain the commitments that she sought from those employees.[13] The jury also could have found that by providing Pope a written comparison of the cost of job benefits at Talon and Security Title to show her co-workers, Clifford aided and abetted Pope's efforts to persuade the better part of Branch 66 to come with her. Likewise, the jury could have found that Clifford also assisted Pope's improper solicitation by assuring her a signing bonus that she could promise to share with employees who agreed to depart Security Title with her, and provided additional assistance by working with Pope to draw up office plans in expectation of the move by Branch 66 employees to Talon. The jury also could have found that First American aided Pope to solicit her co-workers by agreeing with her ahead of time on the specific job title, salary and bonus to be awarded to each new employee.

---

13. Indeed, Veltri of First American testified that Clifford's meeting with the department heads would make it easier for Pope to recruit the employees.

¶ 69 Furthermore, the jury could have concluded that Clifford provided substantial assistance and encouragement when he instructed Pope to bring the Branch 66 employees over to Talon "in waves." While that plan ultimately failed due to the mass walkout on October 20, the jury could have concluded that Clifford's advice aided Pope to carry out her improper solicitation.

¶ 70 The jury also may have found that by agreeing to indemnify Pope for actions taken while still employed by Security Title, First American substantially assisted Pope in improperly soliciting Branch 66 employees. The evidence shows that after speaking to Halvorsen, Kermott and the outside attorney, Pope was "in a dither" because she already had breached her fiduciary duty to Security Title, thereby opening herself to the risk of personal liability. Rather than take the risk that Pope would, in Halvorsen's words, "shut down and not continue discussions," First American sought to repair the "damage" by agreeing to indemnify Pope.

¶ 71 The jury could have concluded that Clifford knew exactly why Pope grew so concerned at hearing the cautionary advice from Halvorsen, Kermott and the outside lawyer. Clifford knew that by the time those discussions occurred, Pope already had taken significant affirmative steps to solicit key co-workers and others—and that by meeting with them and providing information for her to convey to those co-workers, Clifford himself had assisted in that effort. It was Clifford who assured Pope after her call with the lawyer that First American would indemnify her "against anything." The jury reasonably could infer that First American resolved to offer Pope a broad indemnity so she would feel free to continue her efforts to recruit Branch 66 employees.[14]

¶ 72 Finally, First American argues Security Title failed to prove that Pope's breach caused Security Title harm. Security Title presented expert testimony at trial that it incurred $12,194,335 in lost profits as a result of wrongdoing by Pope and First American.

In awarding $6.3 million to Security Title, the jury plainly exercised its obligation to weigh the evidence regarding the harm Security Title alleged.

¶ 73 On appeal, First American does not argue that the damages the jury awarded were too high; it argues instead that the evidence did not prove that Pope's wrongful conduct injured Security Title to any degree. It argues that although one customer testified he took his business to Talon because he was loyal to a Branch 66 employee who had moved there, Security Title did not prove that employee left because of wrongdoing, nor did it prove that "*all* customers left because of their relationships with an employee other than Pope."

¶ 74 We do not agree that Security Title failed to prove it was injured as a result of Pope's wrongful solicitation. We already have concluded the evidence reasonably supports a conclusion that Pope breached her fiduciary duty by improperly soliciting Security Title's employees, and it follows that the jury reasonably could have concluded the Branch 66 employees who joined Talon left Security Title because of Pope's wrongdoing. Moreover, to prove causation, Security Title was not required to prove that all of the customers who transferred their business to Talon did so due to relationships they had with employees other than Pope. Security Title only was required to prove that Pope's breach of her fiduciary duty caused some harm to Security Title. Sufficient evidence supports a conclusion that Pope improperly solicited Branch 66 employees, those employees left Security Title and moved to Talon and their customers moved to Talon with them, thereby causing harm to Security Title.

¶ 75 Westfall, for example, testified that when she moved from Security Title to Talon, the customers for whom she had been the primary contact moved their business to Talon. Similarly, Tucker testified that Pope's customers and those of all of the Branch 66 employees who left Security Title moved

---

14. First American argues that the indemnification agreement was intended only to protect Pope for "good faith" actions. That argument is belied by the facts that Clifford told Pope they would indemnify her "against anything" and that Veltri testified First American was defending Pope in the lawsuit at hand despite the fact that she had not acted in good faith.

their business to Talon. Moreover, the co-owner of Forte Homes testified that he moved his business from Security Title to Talon because the escrow officer he worked with at Security Title moved to Talon.

¶ 76 Based on the foregoing, the jury reasonably could have found that Pope breached the fiduciary duty she owed Security Title and that First American aided and abetted Pope's breach, causing damage to Security Title.

#### 4. Arizona Revised Statutes § 12–2506(D) does not supplant common-law aiding-and-abetting.

 ¶ 77 First American argues in the alternative that judgment should have been entered in its favor on Security Title's aiding-and-abetting claim because in a special interrogatory, the jury found First American did not act in concert with Pope. First American argues that common-law aiding-and-abetting claims have been supplanted by A.R.S. § 12–2506(D) (2003), which, as relevant here, permits imposition of joint-and-several liability only when parties act "in concert." First American contends that A.R.S. § 12–2506(D) and common-law aiding-and-abetting liability "address the same principle—the imposition of joint and several liability when parties act in concert, including one person's aiding another's breach of duty." Because the jury found that First American did not act in concert with Pope, First American argues that it may not be held liable on an aiding-and-abetting claim for damages caused by Pope's breach.[15]

¶ 78 We disagree. We note that in *Wells Fargo*, an opinion issued more than a decade after A.R.S. § 12–2506 was enacted, our supreme court clearly recognized a common-law aiding-and-abetting claim as embodied in the Restatement of Torts. *See Wells Fargo*, 201 Ariz. at 485, ¶ 31, 38 P.3d at 23; *see also* 1987 Ariz. Sess. Laws, ch. 1, § 2 (1st Reg. Sess.).

¶ 79 More generally, we find no Arizona authority supporting First American's contention that in carving out an exception to its abolition of joint-and-several liability for parties who act in concert, the legislature sought to eliminate common-law aiding-and-abetting claims. First American's argument to the contrary ignores the distinction between a legal claim and the allocation of responsibility for damages assessed on a claim. By enacting section 12–2506 in 1987, the legislature generally eliminated joint-and-several liability, replacing it with a system of comparative fault. Nothing in section 12–2506 altered the longstanding common law of aiding-and-abetting liability, however. Contrary to First American's contention, by providing that defendants who act in concert may be held jointly and severally liable, the legislature did not establish a new theory of liability—a claim called "acting in concert"—that was intended to replace claims for aiding and abetting. Instead, the legislature provided only that if defendants (including a defendant who aids and abets another) act in concert, they may be held jointly liable for all of the resulting damages. The superior court did not err in refusing to grant First American's motion for JMOL on the aiding-and-abetting claim.

#### C. The Court Erred in Setting Aside the Punitive Damages Award Assessed Against First American.

##### 1. Introduction.

¶ 80 In setting aside the punitive damages award against First American, the superior court stated:

> The Court is unable to determine what evidence presented at trial would support a jury's verdict that [First American] acted so egregiously so as to support a punitive damages award based on the argument that [First American] [ ] consciously disregarded a substantial risk that [its] conduct

---

15. The court explained to the jury that if it found that First American and Pope acted in concert, each would be liable for the other's percentage of fault. The court instructed that "[a]cting in concert means entering into a conscious agreement to pursue a common plan or design to commit an intentional tort and actively [taking] part in that

intentional tort." The court additionally told the jury that even if First American provided substantial assistance to Pope in committing an intentional tort, it did not act in concert with Pope if it did not "consciously agree" with her to commit the tort.

might significantly injure Security Title. At best, [First American's] offer of an indemnity agreement to Pope might be the basis for such an award; however, the Court is not satisfied that an indemnification agreement is so egregious as to support punitive damages under the evidence presented in this case. While an indemnification agreement could support a finding of liability against [First American], the Court is not persuaded, after hearing all of the evidence, that without Pope and [First American] being found to have acted in concert, that punitive damages lie against [First American].

We disagree with the superior court and conclude sufficient evidence supports the jury's award of punitive damages against First American, even though the jury did not find that Pope and First American acted in concert. *See* A.R.S. § 12–2506(F)(1).[16]

### 2. Legal principles and standard of review.

▮▮▮▮▮▮ ¶ 81 In Arizona, "[p]unitive damages are awarded only 'in the most egregious of cases,' " where it is proved by clear and convincing evidence that the defendant engaged in " 'reprehensible conduct' and acted 'with an evil mind.' " *Medasys Acquisition Corp. v. SDMS, P.C.*, 203 Ariz. 420, 424, ¶ 17, 55 P.3d 763, 767 (2002) (quoting *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 331–32, 723 P.2d 675, 680–81 (1986)); *see also Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 132, 907 P.2d 506, 518 (App.1995) ("To recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant engaged in aggravated and outrageous conduct with an evil mind.") (internal quotation omitted). Thus, the critical inquiry is whether an award of punitive damages "is appropriate to penalize a party for 'outwardly aggravated, outrageous, malicious, or fraudulent conduct' that is coupled with an 'evil mind.' " *Medasys*, 203 Ariz. at 424, ¶ 18, 55 P.3d at 767 (quoting *Linthicum*, 150 Ariz. at 331, 723 P.2d at 680). "A defendant acts with the requisite evil mind when he intends to injure

or defraud, or deliberately interferes with the rights of others, 'consciously disregarding the unjustifiable substantial risk of significant harm to them.' " *Hyatt Regency*, 184 Ariz. at 132, 907 P.2d at 518.

▮▮▮▮▮ ¶ 82 Punitive damages may be imposed in aiding and abetting and breach-of-fiduciary duty cases. *Rodgers v. Bryan*, 82 Ariz. 143, 151, 309 P.2d 773, 778 (1957) (aiding and abetting); *Rhue v. Dawson*, 173 Ariz. 220, 232, 841 P.2d 215, 227 (App.1992) (breach of fiduciary duty). Moreover, "[a] jury's decision to award punitive damages should be affirmed if any reasonable evidence exists to support it." *Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 599, 734 P.2d 76, 84 (1987).

¶ 83 Finally, we reiterate that our review of a JMOL is de novo. *Shoen*, 191 Ariz. at 65, 952 P.2d at 303. The superior court properly grants JMOL "only if the facts presented in support of a claim have so little probative value that reasonable people could not find for the claimant." *Id.* We view "the evidence in a light most favorable to upholding the jury verdict" and will affirm "if any substantial evidence exists permitting reasonable persons to reach such a result." *Hutcherson*, 192 Ariz. at 53, ¶ 13, 961 P.2d at 451.

### 3. Security Title offered evidence that First American acted with an evil mind.

▮▮▮▮ ¶ 84 Sufficient evidence demonstrates that in aiding and abetting Pope's wrongful solicitation of Security Title's employees, First American consciously disregarded the fact that its actions would pose a substantial risk of significant harm to Security Title. *See Hyatt Regency*, 184 Ariz. at 132, 907 P.2d at 518. Veltri testified he knew that Security Title's loss of Pope and the rest of the Branch 66 employees would be a "blow" to Fidelity, and Clifford testified that the loss of Pope and the other Branch 66 employees would cause substantial harm to Security Title. In spite of that knowledge, the evidence shows that First American's

---

**16.** Parties who act "in concert" may be subject to joint-and-several liability. *See supra* ¶¶ 77–79 and note 15. An award of punitive damages, however, does not turn on the parties acting "in concert." *See infra* ¶¶ 81–83.

goal was to obtain for itself the $8 million in annual revenue generated by Branch 66 by recruiting Pope and, in turn, having her bring with her the other Branch 66 employees and customers loyal to those employees.

¶ 85 First American nevertheless contends its acts do not merit punitive damages because its conduct "never amounted to anything more than competitive business practices prevalent in the title insurance industry." In support, First American cites several cases endorsing a privilege of competition. We recognize the existence of a privilege to compete. *See, e.g., Ulan v. Vend–A–Coin, Inc.,* 27 Ariz.App. 713, 717, 558 P.2d 741, 745 (1976) ("[I]t may be gleaned that the privilege to engage in business and to compete with others implies the additional privilege to induce third persons to do their business with the actor rather than with his competitors."). However, First American points us to no authority, and we find none, for the proposition that one has a privilege to compete by unlawful means, such as aiding and abetting a breach of fiduciary duty. Absent such authority, we are not convinced the competition privilege is applicable in this case.

¶ 86 More generally, we decline First American's implicit invitation to hold that as a matter of law, punitive damages are not recoverable by one commercial enterprise on a claim brought against another commercial enterprise. First American argues that to the extent that Security Title was harmed by the acts alleged at trial, the jury's compensatory damages award made Security Title whole. But that is true in most any tort case, even those, such as insurance bad-faith actions or other claims by individuals against businesses, in which punitive damages are more common. Our law permits an award of punitive damages, *inter alia,* "to punish the wrongdoer and to deter others from emulating his conduct." *Linthicum,* 150 Ariz. at 330, 723 P.2d at 679. We

have no reason to believe that these purposes are served any less when applied to conduct in the marketplace than in other contexts. *See Medasys,* 203 Ariz. at 424, ¶ 19, 55 P.3d at 786 (punitive damages may be based on award of rescissory damages in commercial context).

#### 4. The jury heard evidence that First American's conduct was outwardly outrageous.

¶ 87 Sufficient evidence also supports a conclusion that taken together, First American's various acts in aiding and abetting Pope were outrageous.[17]

¶ 88 Arizona courts have upheld punitive damages based on egregious conduct in other commercial contexts. In *Hyatt Regency,* for example, punitive damages were upheld against a law firm that represented clients with conflicting interests, ultimately causing one of them to be subjected to "unjustifiable risks of personal liability." 184 Ariz. at 132, 907 P.2d at 518. In *Rhue,* punitive damages were upheld against a partner who breached his fiduciary duty to another partner by pressuring him to sign an agreement with an unfavorable buyout clause without pointing out the clause, and then seeking to exercise a buyout pursuant to the clause. 173 Ariz. at 224, 232, 841 P.2d at 219, 227.

¶ 89 In other jurisdictions, punitive damages likewise have been upheld in cases of outrageous conduct in commercial contexts. In *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), punitive damages were awarded against an oil producer that attempted to profit unfairly from another by a series of deceptive acts calculated to trigger a contract clause that, if implicated, would grant it a great advantage. The West Virginia Supreme Court of Appeals affirmed a $10 million punitive damages award against the producer, and the United States Su-

---

17. Security Title argues that a showing of outwardly outrageous or aggravated conduct is unnecessary and that all it was required to show was that First American acted with an evil mind by consciously disregarding a significant risk of injury. We do not agree. *See Saucedo ex rel. Sinaloa v. Salvation Army,* 200 Ariz. 179, 182,

¶ 11, 24 P.3d 1274, 1277 (App.2001) ("Although the element of a tortfeasor's intent may be inferred, a plaintiff must always prove 'outwardly aggravated, outrageous, malicious, or fraudulent conduct.'" (quoting *Linthicum,* 150 Ariz. at 331, 723 P.2d at 680)).

preme Court upheld the award. *Id.* at 447–51, 113 S.Ct. 2711. Applying New Jersey law, the court in *Inter Medical Supplies, Ltd. v. EBI Medical Systems, Inc.*, 181 F.3d 446, 452–53, 468–69 (3d Cir.1999), found punitive damages were supported in a case in which a manufacturer engaged in unfair competition, including passing off its own products as those of a competitor and deceptively advertising its products as upgrades of the competitor's.[18] Likewise, in *Conseco Finance Servicing Corp. v. North American Mortgage Co.*, 381 F.3d 811, 815–16, 825 (8th Cir.2004), punitive damages were affirmed (albeit reduced) in an unfair competition case involving claims by a business that a competitor had "raided" its employees and encouraged them to bring with them customer leads and confidential information from the plaintiff company. *Id.* at 820. The court found that punitive damages were appropriate because, *inter alia*, the defendant company was motivated by a desire to expand its business "at any cost," that management did not investigate or correct the wrongful acts by its employees but instead promoted those acts, and that its actions involved trickery and deceit and demonstrated an "utter disregard" for the competitor and its customers. *Id.* at 824.

¶ 90 We also are guided by *American Republic Insurance Co. v. Union Fidelity Life Insurance Co.*, 470 F.2d 820 (9th Cir.1972), another wrongful solicitation case in which the Ninth Circuit upheld an award of punitive damages against the corporate defendant, an insurance company named Union. In attempting to staff a newly formed division, Union recruited Lindgren, an area manager employed by the plaintiff, one of Union's competitors. *Id.* at 822. Prior to terminating his employment with the plaintiff, Lindgren persuaded several of plaintiff's employees to join him at Union, and once there, he used customer leads generated while at his former employer. *Id.* at 823. The Ninth Circuit held Lindgren's solicitation of plaintiff's employees amounted to unfair competition. *Id.* at 824. It also found that Union "was a party to the illegal actions

of Lindgren" because Union knew that Lindgren was recruiting the plaintiff's employees while he was employed by plaintiff, knew he was using the other company's customer leads, took no actions to prevent Lindgren's wrongful conduct, and in fact benefited from those wrongful acts. *Id.* at 823–26. Applying Oregon law, the court upheld an award of punitive damages because "[t]he evidence was that Union acted in willful, wanton and reckless disregard of" the other company's rights. *Id.* at 826.

¶ 91 We conclude the evidence supports a conclusion that First American's conduct was at least as egregious as in *American Republic* and other commercial cases in which punitive damages awards have been upheld. First American knew that Pope was recruiting Security Title's employees and yet made little effort to stop her (Kermott's and Halvorsen's words of caution were effectively overridden by Clifford's eager assistance of Pope in her solicitation efforts). Moreover, the jury could have concluded that by agreeing to indemnify her, in Clifford's words, "against anything," First American sought to free Pope from the constraint of personal liability for her actions while on Security Title's payroll. On behalf of First American, Clifford promised guaranteed commissions and signing bonuses for Pope to use as incentives to win commitments by her co-workers to come with her to Talon. Moreover, the evidence showed that Clifford counseled Pope on how the Branch 66 employees should depart Security Title ("in waves") so as to conceal her improper solicitation of them.

¶ 92 This evidence, considered together, is a sufficient basis on which the jury could find by clear and convincing evidence that First American committed the outrageous conduct necessary to support an award of punitive damages.

## D. The Punitive Damages Award the Jury Assessed Against First American Is Unconstitutionally Excessive.

¶ 93 First American argues that even if the jury could reasonably infer that

---

18. Analyzing the punitive damages award against constitutional standards, the court did, however, reduce the award to $1 million from the $50 million award ordered by the district court on remittitur. We address the amount of the jury's punitive damages award in this case *infra* ¶¶ 107–108.

its conduct was outrageous and it acted with an evil mind, the punitive damages award assessed against it does not satisfy due process. The Due Process Clause of the United States Constitution "imposes a substantive limit on the size of punitive damages awards." *Hilgeman v. Am. Mortgage Sec., Inc.*, 196 Ariz. 215, 222, ¶ 26, 994 P.2d 1030, 1037 (App.2000) (quoting *Honda Motor Co. v. Oberg*, 512 U.S. 415, 420, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994)); *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ("States possess discretion over the imposition of punitive damages," but the Due Process Clause "prohibits the imposition of grossly excessive or arbitrary" awards).

¶ 94 The United States Supreme Court has instructed courts to consider three guideposts when reviewing punitive damages awards: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418, 123 S.Ct. 1513.[19] Appellate courts are to conduct a de novo review of the trial court's application of the guideposts to the jury's award. *Id.*

### 1. Reprehensibility.

¶ 95 The degree of the reprehensibility of the defendant's conduct is the "most important indicium of the reasonableness of a punitive damages award." *Id.* at 419, 123 S.Ct. 1513 (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)); *see Exxon Shipping Co. v. Baker*, —— U.S. ——, 128 S.Ct. 2605, 2621, 171 L.Ed.2d 570 (2008) ("degrees of relative blameworthiness are apparent"; analyzing limits on punitive damages permitted under maritime law). In determining the reprehensibility of the defendant's conduct, courts are to consider whether:

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419, 123 S.Ct. 1513. The Court cautioned that the "existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.* We conclude that at least one of the reprehensibility factors is present in this case: The harm Security Title suffered was a result of "intentional malice, trickery, or deceit" by First American and not "mere accident." *See id.*[20]

¶ 96 We begin our analysis of reprehensibility by recognizing that cases in which the harm is purely economic and only a few of the reprehensibility factors are present require closer constitutional scrutiny than do cases in which the harm is physical and more *State Farm* factors are present. *See, e.g., Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 487 (6th Cir.2007) ("[W]here only one of the reprehensible factors is present, a ratio in the range of 1:1 to 2:1 is all that due process will allow."); *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 191–92 (3d Cir. 2007) (punitive damages award reduced in part because harm was economic and only three reprehensibility factors were present); *Inter Med.*, 181 F.3d at 467 (economic harm

**19.** We do not analyze the third guidepost because it neither weighs for nor against the punitive damages award in this case. Aiding and abetting is a common-law tort, and we agree with the Tenth Circuit that "a violation of common law tort duties [may] not lend [itself] to a comparison with statutory penalties." *See Cont'l Trend Res., Inc. v. Oxy USA Inc.*, 101 F.3d 634, 641 (10th Cir.1996). Moreover, neither party

points us to a civil penalty that is sufficiently analogous to allow for comparison.

**20.** Security Title asserts that Branch 66 was a financially vulnerable target. Mindful of evidence that at the time First American was recruiting Pope, Branch 66 had an annual revenue of approximately $8 million, we do not believe this reprehensibility factor applies.

is "less worthy of large punitive damages awards than torts inflicting injuries to health or safety"; award reduced even though defendant had acted with intentional malice (quoting *Cont'l Trend Res., Inc. v. Oxy USA Inc.*, 101 F.3d 634, 638 (10th Cir.1996))).

¶ 97 The reprehensibility factor of harm suffered as "the result of intentional malice, trickery, or deceit" rather than "mere accident" may be satisfied when the defendant commits willful acts in derogation of the plaintiff's rights. *See, e.g., Bridgeport*, 507 F.3d at 486 (in a copyright infringement case, the harm was the result of intentional malice or deceit because the defendant acted willfully by ignoring pre-litigation letters and re-releasing album knowing it contained an "unauthorized sample"); *S. Union Co. v. Sw. Gas Corp.*, 415 F.3d 1001, 1010 (9th Cir.2005) (harm was caused by trickery and deceit when it "was the culmination of two months of planning and activity" and the "purposeful persistence in this effort" was matched by efforts at concealment).

¶ 98 The evidence supports the conclusion that, like the harm in *Bridgeport* and *S. Union*, the harm in this case was not accidental but was instead the result of intentional malice. The jury could have found that over a period of nearly two months, First American willfully aided and abetted Pope's solicitation of Security Title's employees that resulted in the mass walkout. In order for the jury to have awarded punitive damages against First American, it necessarily found that First American acted with an evil mind. *See Hyatt Regency*, 184 Ariz. at 132, 907 P.2d at 518 (defendant acts with an evil mind if he intends to injure or consciously disregards an unjustifiable and substantial risk of significant harm). Because First American acted with an evil mind, it necessarily acted with intentional malice for purposes of the *State Farm* reprehensibility guidepost.[21]

¶ 99 The evidence also supported a conclusion that Security Title's harm was the result of trickery and deceit. First American attempted to conceal its wrongful actions by keeping the fact that it was opening the Talon office confidential, hiding in the company email directory the names of the Branch 66 employees that soon would be joining Talon, counseling Pope about the sequence in which the Branch 66 employees should leave so it would not appear that she recruited them prior to her leaving Security Title, and, once the employees left Security Title for Talon, inducing them to sign a letter falsely stating they were terminated pursuant to an ultimatum when they were not terminated nor did they receive an ultimatum.[22]

¶ 100 Security Title also argues First American has engaged in similar bad acts elsewhere, citing *Chicago Title Insurance Corp. v. Magnuson*, 487 F.3d 985 (6th Cir. 2007). In *Chicago Title*, as here, First American was sued for its conduct in seeking to staff its newly formed Talon division. *Id.* at 989. First American had recruited one of Chicago Title's former managers who remained subject to a non-compete agreement with Chicago Title. *Id.* The non-compete agreement prohibited the former employee from "acting in any capacity for a title insurance company in … Columbus, Ohio" for five years following the expiration of his employment contract. *Id.* First American

---

**21.** *Malice is defined, in part, as "[t]he intent, without justification or excuse, to commit a wrongful act" or the "[r]eckless disregard of the law or of a person's legal rights." Black's Law Dictionary 976 (8th ed.2004).*

**22.** At oral argument, First American's counsel asserted that conduct that occurred after Pope's breach may not give rise to a punitive damages award. *See Saucedo*, 200 Ariz. at 184, ¶ 19, 24 P.3d at 1279 ("[T]he conduct giving rise to punitive damages must be a proximate cause of the harm inflicted."). In determining whether a defendant's conduct was reprehensible for the purpose of deciding if an award is constitutionally excessive, however, we may consider a defendant's attempt to conceal its wrongdoing. *See*

*Romano v. U–Haul Int'l*, 233 F.3d 655, 673 (1st Cir.2000) (defendant's actions were reprehensible where it violated plaintiff's rights and then attempted to conceal the violation); *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1127 (9th Cir.1994) (punitive damages award was constitutionally permissible where defendant concealed studies relating to product defects); *cf. Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 497, 733 P.2d 1073, 1080 (1987) (in calculating "a punitive damage award that is reasonable under the circumstances," the trier-of-fact may consider the "duration of the misconduct, the degree of defendant's awareness of the harm or risk of harm, and any concealment").

agreed to indemnify the former employee "for any liability he might incur as a result of making the move" to Talon, and it placed him in one of Talon's Columbus offices, where he recruited workers from his former employer and participated in sales calls with Columbus-area clients. *Id.* at 989–90, 997. The district court granted Chicago Title summary judgment on its claim against First American for tortious interference with a contract. *Id.* at 990.

¶ 101 First American's counsel asserted at oral argument that we may not consider First American's conduct in *Chicago Title* because that evidence was not before the jury and if it had been, First American would have attempted to show that it was dissimilar to the conduct in this case. *See State Farm,* 538 U.S. at 422, 123 S.Ct. 1513 (a "defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages").[23]

¶ 102 We need not decide, however, whether it was appropriate to consider First American's conduct in *Chicago Title* or whether First American's conduct in that case was sufficiently similar to its conduct in this case to satisfy the "repeated actions" factor of the reprehensibility guidepost. Even without considering possible other acts by First American, we conclude that First American's conduct in this case was sufficiently reprehensible to justify an award of punitive damages against it.

### 2. Ratio of compensatory damages to punitive damages.

¶ 103 Regarding the second guidepost, the Supreme Court in *State Farm* acknowledged that it has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plain-

tiff and the punitive damages award." 538 U.S. at 424, 123 S.Ct. 1513. The Court declined to "impose a bright-line ratio which a punitive damages award cannot exceed," but observed that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* The Court also stated that "[w]hen compensatory damages are substantial, ... a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* at 425, 123 S.Ct. 1513.

¶ 104 In this case, the compensatory damages award in our view was substantial, and the punitive damages were more than five times the compensatory damages; the ratio between the compensatory and punitive damages assessed against First American is 5.7:1. Security Title argues, however, that the "potential damage, had [First American] succeeded in its goal of obtaining *all* of Branch 66's business was $12.2 million" and therefore "the proper ratio for the due-process analysis is only 2.8:1." *See TXO Prod.,* 509 U.S. at 460, 113 S.Ct. 2711 ("It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded....").

¶ 105 As noted, an expert testified that Branch 66's loss of profits from October 2003 forecasted through 2008 was $12,194,335. No evidence was presented, however, of the amount Security Title might have suffered if Pope and First American had been successful in transferring all of Branch 66's revenue to Talon. Therefore, the correct ratio to consider for our analysis is 5.7:1.

¶ 106 Taken together, because (1) Security Title suffered economic harm rather than physical harm, (2) First American's acts did

**23.** We also note that jurisdictions differ as to whether "repeated actions" for this purpose may consist solely of acts against the plaintiff or whether the plaintiff must show that the defendant has committed outrageous acts against another. *Compare CGB Occupational Therapy,* 499 F.3d at 191 ("[W]hile the 'repeated conduct' subfactor will necessarily have 'less force' where the defendant's misconduct did not extend beyond his dealings with the plaintiff," "it may still be 'relevant' in measuring the reprehensibility of the defendant's conduct." (quoting *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.,* 399 F.3d 224, 232–33 (3d Cir.2005))) *with Chicago Title,* 487 F.3d at 1000 ("[W]e interpret[ ] the repeated conduct factor to 'require that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with the plaintiff.'" (quoting *Bach v. First Union Nat'l Bank,* 149 F. App'x 354, 356, 2005 WL 2009272 (6th Cir. 2005))).

not threaten individual health or safety, (3) only one or, at most, two reprehensibility factors may be present, and (4) Security Title received a substantial compensatory damages award, we hold that the jury's award of punitive damages against First American in an amount more than five times the compensatory damages award is unconstitutionally excessive. *See, e.g., Bach v. First Union Nat'l Bank,* 486 F.3d 150, 155–57 (6th Cir. 2007) (reducing $2.6 million punitive damages award to $400,000, the amount of the compensatory damages award, where only one reprehensibility factor present); *Clark v. Chrysler Corp.,* 436 F.3d 594, 608 (6th Cir. 2006) (reducing $3 million punitive damages award to $471,258.26, an amount twice the compensatory award, where the plaintiff's conduct was not highly reprehensible); *Conseco,* 381 F.3d at 814, 825 (reducing $18 million punitive damages award to $7 million because of the "significant" disparity between punitive damages award and the $3.5 million awarded in compensatory damages); *cf. Exxon,* 128 S.Ct. at 2610 (applying maritime law, reducing $2.5 billion award to $507.5 million; a 1.1 ratio "is a fair upper limit" for punitive damage awards).

### 3. Constitutionally permissible amount of punitive damages.

¶ 107 "The role of gatekeeper over ... punitive damages verdicts is one of the most challenging that has been placed upon appellate judges in civil cases." *Inter Med.,* 181 F.3d at 450. In exercising this role, we are mindful of Justice Kennedy's words in *TXO Production*:

> To ask whether a particular award of punitive damages is grossly excessive begs the question: excessive in relation to what? The answer excessive in relation to the conduct of the tortfeasor may be correct, but it is unhelpful, for we are still bereft of any standard by which to compare the punishment to the malefaction that gave rise to it. A reviewing court employing this formulation comes close to relying upon nothing more than its own subjective reaction to a particular punitive damages award in deciding whether the award violates the Constitution. This type of review, far from imposing meaningful, law-like restraints on jury excess, could become as fickle as the process it is designed to superintend.

509 U.S. at 466–67, 113 S.Ct. 2711 (Kennedy, J., concurring). We agree with the Third Circuit that rather than rely on our "subjective reaction" to the jury's award, we must act based on our "combined experience and judgment" when constitutional principles and our careful review of the record convinces us that a punitive damages award must be reduced. *See Inter Med.,* 181 F.3d at 468.

¶ 108 The cases teach that because application of due process principles to punitive damages awards depends so much on the facts and the record, there are few absolute rules of broad application to guide us in establishing a constitutionally permissible measure of a punitive damages award in any particular case. In this case, having decided that the facts and the record do not support the amount of punitive damages awarded by the jury, we are guided by the Supreme Court's suggestion in *State Farm* that when the compensatory damages award is substantial, a punitive damages award equal to the compensatory award may "reach the outermost limit of the due process guarantee." 538 U.S at 425, 123 S.Ct. 1513. On these facts and this record, particularly given the substantial compensatory damages awarded, we order that the punitive damages award assessed against First American be reduced to $6,100,290, the amount of compensatory damages assessed against the company.

### E. The Superior Court Did Not Err in Awarding First American and Pope Their Fees and Costs After the Mistrial.

¶ 109 Security Title argues the superior court erred in imposing sanctions against it following a mistrial granted after Tarpley testified that Pope had a "personal vendetta" against Schneider, Security Title's founder. The court granted the mistrial because it found that Security Title had not disclosed that testimony, which was prejudicial to Pope. Following the mistrial, First American and Pope moved for various sanctions against Security Title. Although the

court declined to enter other proposed sanctions, it announced it would consider granting fees:

> Upon submission of appropriate affidavits, the Court will consider granting an award of attorneys' fees to defendants for the limited work made necessary as a result of the conduct leading up to the mistrial and after the mistrial was declared.

\* \* \*

> IT IS ORDERED granting consideration of defendants' request for attorneys' fees from November 1, 2005 (the making of the motion for mistrial) through post-mistrial motion practice.

¶ 110 First American filed an application seeking $72,540 in fees and $3,804.29 in costs; Pope sought $27,000 in fees and $181.69 in costs. Security Title opposed the requests and asked for an evidentiary hearing. Without a hearing, the court granted the requested fees and costs in their entirety.

 ¶ 111 Absent an abuse of discretion, we will not disturb a superior court's decision to grant sanctions resulting from a disclosure violation. *Taliaferro v. Taliaferro,* 188 Ariz. 333, 339, 935 P.2d 911, 917 (App.1996). Pursuant to Arizona Rule of Civil Procedure 37(c)(1), "[a] party who fails to timely disclose information required by Rule 26.1 shall not, unless such failure is harmless, be permitted to use as evidence at trial ... the information ... not disclosed." Rule 37(c)(1) further provides that "other appropriate sanctions" may be imposed on the party, including reasonable expenses and attorney's fees "caused by the failure" to disclose.

¶ 112 On appeal, Security Title first argues that it had no duty to disclose Tarpley's testimony under Rule 26.1(a)(3) because although it "proffered Tarpley as a witness," "Tarpley was [First American's] employee, working under Pope, for most of the pre-trial litigation, including when disclosures were exchanged, and because [Security Title] had no intention of eliciting the 'vendetta' testimony" and therefore the testimony was not "expected testimony." Relevant to this issue are Rule 26.1(a)(3), which provides that "each party shall disclose" "a fair description of the substance of each witness's expected testimony," and (4), which requires the disclosure of "all persons whom the party believes may have knowledge or information relevant to the events ... and the nature of the knowledge or information each such individual is believed to possess."

¶ 113 While testifying, Tarpley said twice that she thought Pope had a vendetta against Schneider. The second time came in response to the following question by Security Title's counsel: "Did Mrs. Pope ... ever say anything to you that led you to understand that she was motivated in part by anger at Security Title over how she perceived herself as being treated?"

¶ 114 After Pope's counsel objected to Tarpley's testimony, the following took place at sidebar between the court and Security Title's counsel:

> COUNSEL: [T]he specific item that was addressed here, in terms of a vendetta, which was not responsive directly to the question that I asked, although I had heard of that, I heard of that at the noon hour today....
>
> THE COURT: Did you, when you learned of it, ... give any notice to the other side that there was testimony that had not been known previously that you expected to bring out of Mrs. Tarpley?
>
> COUNSEL: No, your Honor.
>
> THE COURT: Why not?
>
> COUNSEL: It was not my understanding that due to the nature of the disclosures and the general disclosures in this case, that the subject, that the substance was different than the subject matter of the testimony that had been disclosed.

Based on the foregoing dialogues, we conclude the court did not abuse its discretion in determining that Security Title breached its duty to disclose the testimony pursuant to Rule 26.1.

¶ 115 Citing *Taylor v. Southern Pacific Transportation Co.,* 130 Ariz. 516, 637 P.2d 726 (1981), however, Security Title argues the court erred in awarding fees absent a finding it acted "vexatiously, wantonly, or for oppressive reasons." The standard set out in *Taylor* is not relevant to our analysis; it

**506**

applies when there is no statutory authority for the imposition of sanctions and the granting of fees. *See id.* at 523, 637 P.2d at 733. Here, Rule 37(c) allows for sanctions and fees.

¶ 116 Security Title also argues the court erred in awarding fees for legal work outside the scope of the court's order. It argues the court abused its discretion in awarding fees for (1) work related to motions filed by Security Title seeking sanctions against First American and Pope due to their alleged disclosure violations; and (2) work related to Pope's and First American's unsuccessful requests for other sanctions against Security Title.

¶ 117 As to the first category, Security Title contends its "motions were not related in any way to the alleged conduct leading to the mistrial" and that it "had the right to make these motions at any time, regardless of whether there had been a mistrial." In one of its motions for sanctions filed after the mistrial, however, Security Title acknowledged it

> would have preferred to litigate this matter through trial without seeking to exclude Defendants' evidence on the basis of disclosure violations.... But Defendants have succeeded in invoking the disclosure rules offensively against Security Title, including ... by moving for a mistrial (and thereafter sanctions) based on purportedly undisclosed witness testimony.

Based on this statement, the court reasonably could have found Security Title's filing of the motions for sanctions related to the mistrial.

¶ 118 Security Title objects to the second category of fees, citing *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (App.1983), for the proposition that First American and Pope cannot be awarded fees for work related to sanctions they asked for but were not granted. *Schweiger,* however, deals with fee awards in contract disputes and not sanctions for disclosure violations. *Id.* at 185, 673 P.2d at 929. Security Title also cites a number of cases for the proposition that a court may consider the success of a party's claims when deciding whether to award the party attorney's fees. Because

the cited cases do not involve sanctions granted pursuant to Rule 37, they are not relevant to this case.

## CONCLUSION

¶ 119 For the foregoing reasons, we affirm the superior court's denial of First American's motion for JMOL on Security Title's aiding-and-abetting claim and vacate that portion of the court's order setting aside the punitive damages award assessed against First American, but we reduce the amount of punitive damages awarded against First American to $6,100,290. We also affirm the superior court's order granting First American and Pope their fees and costs relating to the mistrial.

CONCURRING: JON W. THOMPSON and ANN A. SCOTT TIMMER, Judges.